# CONTRATO COMPLEXO E ATÍPICO DE ESTRUTURAÇÃO E DESENVOLVIMENTO DE EMPREENDIMENTO IMOBILIÁRIO E OUTRAS AVENÇAS

celebrado entre

## ASSOCIAÇÃO NÓBREGA DE EDUCAÇÃO E ASSISTÊNCIA SOCIAL – ANEAS,

e

## TS-26 PARTICIPAÇÕES LTDA.

E, ainda como Intervenientes:

## TSM DESENVOLVIMENTO IMOBILIÁRIO LTDA.

e

## TS GESTÃO E CONSULTORIA IMOBILIÁRIA LTDA

São Paulo, 08 de abril de 2020

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

## ÍNDICE

CLÁUSULA I.      DAS DEFINIÇÕES ........................................................................ 6

CLÁUSULA II.     DO OBJETO ................................................................................ 13

CLÁUSULA III.    DOS PROCEDIMENTOS DE APROVAÇÃO .............................. 15

CLÁUSULA IV.     DA EXECUÇÃO DAS OBRAS DE MELHORIA E READEQUAÇÃO... 17

CLÁUSULA V.      DA GESTÃO IMOBILIÁRIA E DA ADMINISTRAÇÃO PREDIAL ...... 20

CLÁUSULA VI.     DO PRAZO DE VIGÊNCIA DO CONTRATO ............................. 24

CLÁUSULA VII.    DAS CONDIÇÕES SUSPENSIVAS ........................................... 24

CLÁUSULA VIII.   DO PREÇO E DAS CONDIÇÕES DE PAGAMENTO ................ 24

CLÁUSULA IX.     DAS GARANTIAS ....................................................................... 32

CLÁUSULA X.      DA RESOLUÇÃO ........................................................................ 34

CLÁUSULA XI.     DA ENTREGA DO CONJUNTO SÃO LUÍS ............................. 38

CLÁUSULA XII.    DA CESSÃO DE CRÉDITOS E CONSTITUIÇÃO DE FUNDOS DE
INVESTIMENTO ......................................................................................................... 39

CLÁUSULA XIII.   DA CONFIDENCIALIDADE ....................................................... 39

CLÁUSULA XIV.    DAS DECLARAÇÕES E GARANTIAS DAS PARTES ............... 41

CLÁUSULA XV.     LIBERAÇÃO DO CONJUNTO SÃO LUÍS E USOS ESPECIAIS DE
DETERMINADAS ÁREAS PELA ANEAS ................................................................. 42

CLÁUSULA XVI.    ALIENAÇÃO DO IMÓVEL E DIREITO DE PREFERÊNCIA ............ 43

CLÁUSULA XVII.   DAS DISPOSIÇÕES GERAIS .................................................... 44

CLÁUSULA XVIII.  DA POLÍTICA ANTICORRUPÇÃO ............................................ 49

CLÁUSULA XIX.    DA ARBITRAGEM ...................................................................... 51

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

## LISTA DE ANEXOS

| # | Conteúdo |
|---|----------|
| (iii) | Alvarás e Certificados de Conclusão/ Habite-se. |
| (iv) | Listagem de Contratos de Locação a Terceiros do Imóvel. |
| (x) | Plano de Negócios. |
| 2.3.1 | Minuta Procuração A. |
| 2.3.2 | Minuta Procuração B. |
| 4.2 | Minuta do Contrato de Construção. |
| 5.3.2 | Minuta Contrato de Administração Predial. |
| 8.1.10 | Memória de Cálculo do Fluxo Financeiro. |
| 8.1.11 | Listagem de Empresas para Escolha da Gerenciadora. |
| 9.1 | Minuta de Hipoteca. |
| 9.2 | Minuta de Cessão Fiduciária dos Recebíveis. |
| 9.3 | Carta de Fiança Corporativa TS. |
| 15.3 | Salões de uso da ANEAS. |
| 17.12 | Mapa Mercado Relevante Conjunto São Luís. |
| 16.8(i) | Aditamento de Admissão do Terceiro Adquirente. |

## CONTRATO COMPLEXO E ATÍPICO DE ESTRUTURAÇÃO E DESENVOLVIMENTO DE EMPREENDIMENTO IMOBILIÁRIO E OUTRAS AVENÇAS

De um lado:

1.　　　**ASSOCIAÇÃO NÓBREGA DE EDUCAÇÃO E ASSISTÊNCIA SOCIAL - ANEAS**, associação civil, com sede na Avenida Paulista, n. 2.300, conjunto 172, Bairro Bela Vista, Município de São Paulo, Estado de São Paulo, CEP 01310-300, inscrita no CNPJ/ME sob o n. 33.544.370/0001-49, neste ato representada na forma de seu Estatuto Social, doravante designada simplesmente "ANEAS";

E, de outro lado:

2.　　　**TS-26 PARTICIPAÇÕES LTDA.**, sociedade empresária limitada, com sede na cidade de São Paulo, Estado de São Paulo, na Avenida das Nações Unidas, n. 12.901, 34º andar, sala 33, Torre Norte, Bairro Brooklin, Município de São Paulo, Estado de São Paulo, CEP 04578-000, inscrita no CNPJ/ME sob o n. 26.970.326/0001-35, com seus atos constitutivos devidamente registrados na JUCESP sob NIRE 35.230.386.074, neste ato representada na forma do seu Contrato Social, doravante designada simplesmente "TS".

ANEAS e TS também referidas individualmente como "Parte" e, em conjunto, como "Partes";

E, ainda, como intervenientes:

3.　　　**TSM DESENVOLVIMENTO IMOBILIÁRIO LTDA.**, sociedade empresária limitada com sede na Cidade de São Paulo, Estado de São Paulo, na Avenida das Nações Unidas, 12.901, 34º andar, Torre Norte, CEP 04578-000, inscrita no CNPJ/ME sob n.º 00.875.299/0001-28, com seus atos constitutivos devidamente registrados na JUCESP sob NIRE 35.218.923.120 ("TS Administradora"); e

4.　　　**TS GESTÃO E CONSULTORIA IMOBILIÁRIA LTDA.**, sociedade empresária limitada com sede na Cidade de São Paulo, Estado de São Paulo, na Avenida das Nações Unidas, 12.901, 34º andar, sala 27, Torre Norte, CEP 04578-000, Brooklin Paulista, inscrita no CNPJ/ME sob n.º 10.262.910/0001-04, com seus atos constitutivos devidamente registrados na JUCESP sob NIRE 35.222.570.830 ("TS Gestora" e, em conjunto com a TS e a TS Administradora, "Grupo TS").

**Considerando que:**

(i)　　　a ANEAS é uma associação civil sem fins lucrativos, certificada como beneficente de assistência social, com a finalidade de prestação de serviços nas áreas da educação e assistência social, nos termos da Lei Federal n. 12.101/2009;

(ii)　　　a ANEAS é legítima proprietária de um imóvel situado no Município de São Paulo, Estado de São Paulo, objeto da matrícula n. 68.519 do 13º Oficial de Registro de Imóveis da Comarca de São Paulo - SP (respectivamente, "Imóvel" e "Matrícula");



Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

(iii)     o Imóvel compreende diversas construções, as quais foram objeto de aprovação pelos alvarás e certificados de conclusão/Habite-se descritos e caracterizados no Anexo (iii) deste Contrato, de tal sorte que há aprovação para construção de 127.700 m$^2$ (cento e vinte e sete mil e setecentos metros quadrados) de área construída no Imóvel ("Área Construída Total") e 127.700 m$^2$ (cento e vinte e sete mil e setecentos metros quadrados) já foram devidamente construídos ("Área Construída Existente");

(iv)     o Imóvel encontra-se parcialmente locado a terceiros, consoante a listagem de contratos de locação constante do Anexo (iv) deste Contrato, que identifica o locatário corrente, a unidade locada, o fiador ou interveniente anuente (se aplicável) e a data de celebração do contrato respectivo ("Locações Existentes");

(v)     o Imóvel foi, nos termos do R.9 e R.10 da Matrícula, objeto de instituição de condomínio edilício e incorporação imobiliária, composto pelas seguintes edificações e respectivas frações ideais: (a) Igreja São Luís, à qual foi atribuída a fração ideal de 1,0849% (um por cento e oitocentos e quarenta e nove décimos milésimos percentuais) do Imóvel e que foi destacada da Matrícula em matrícula independente ("Igreja São Luís"); (b) Edifício Colégio São Luís e Santo Inácio de Loyola, ao qual foi atribuída a fração ideal de 27,5547% (vinte e sete por cento e cinco mil, quinhentos e quarenta e sete décimos milésimos percentuais) do Imóvel ("Colégio São Luís"); (c) Edifício Padre Manoel da Nóbrega, ao qual foi atribuído a fração ideal de 11,3293% (onze por cento e três mil, duzentos e noventa e três décimos milésimos percentuais) do Imóvel; (d) Edifício Padre José de Anchieta, ao qual foi atribuída a fração ideal de 1,3065% (um por cento e três mil e sessenta e cinco décimos milésimos percentuais) do Imóvel; (e) Edifício Garagem São Luís, ao qual foi atribuída a fração ideal de 11,3508% (onze por cento e três mil, quinhentos e oito décimos milésimos percentuais) do Imóvel; e (f) Edifício São Luís de Gonzaga, ao qual foi atribuída a fração ideal de 47,3738% (quarenta e sete por cento e três mil, setecentos e trinta e oito décimos milésimos percentuais) do Imóvel;

(vi)     ainda, nos termos do R.10 da Matrícula, o Edifício São Luís Gonzaga referido no item (f) do considerando (v) acima se encontra em fase de incorporação e foi dividido em diversas futuras unidades autônomas;

(vii)     a ANEAS iniciou, em janeiro de 2020, o deslocamento do Colégio São Luís para um novo imóvel;

(viii)     a ANEAS tem interesse no reenquadramento e reposicionamento do Imóvel, excluída a Igreja São Luís ("Conjunto São Luís"), com a intenção de melhor explorar o Conjunto São Luís;

(ix)     o Grupo TS tem reputação nacional e internacional, com ampla experiência no desenvolvimento e na estruturação de empreendimentos imobiliários, possuindo *expertise* e recursos necessários, inclusive para o custeio das obras e para prover o reenquadramento e reposicionamento do Conjunto São Luís;

(x)     o Grupo TS apresentou para a ANEAS, que aprovou, condicionalmente à discussão dos termos e condições de um contrato definitivo que regulasse a relação entre as Partes, um Plano de Negócios visando ao reenquadramento e reposicionamento do Conjunto São Luís, que constitui o Anexo (x) do presente Contrato ("Plano de Negócios"), o qual contém, entre outras matérias, a perspectiva estimada de rentabilidade do Conjunto São Luís após o

reenquadramento e reposicionamento do Imóvel, o projeto arquitetônico do Conjunto São Luís, contemplando as obras e melhorias a serem efetivadas, com as condições básicas do memorial descritivo e projeção estimada de custos global ("Obras de Melhoria e Readequação"), assim como uma estratégia de reenquadramento comercial do Conjunto São Luís, visando à sua maior rentabilidade ("Reposicionamento Comercial" e, em conjunto com Obras de Melhoria e Readequação, "Projeto Novo CSL");

(xi)      o Plano de Negócios foi elaborado pela TS no interesse mútuo das Partes e envolveu trabalho e *expertise* únicos da TS, razão pela qual a participação da TS no fluxo financeiro mensal do Conjunto São Luís, na forma aqui acordada e pelo prazo aqui previsto, representa também contraprestação justa e necessária por todo o trabalho de gestão e inteligência já aportado e que será continuamente aportado pela TS no Projeto Novo CSL, incluindo, não somente mas também (a) o desenvolvimento do Plano de Negócios, (b) os investimentos relevantes feitos pela TS na elaboração do Plano de Negócios, (c) a provisão dos recursos necessários para a consecução das Obras de Melhorias e Readequação, e (d) os investimentos em gestão e inteligência que serão aportados pela TS, sendo certo que são condições essenciais ao presente negócio (i) a manutenção da propriedade do Conjunto São Luís pela ANEAS durante todo o prazo deste Contrato, exceto quando permitido expressamente neste Contrato, não havendo atualmente interesse da ANEAS em alienar ou transferir o Conjunto São Luís a terceiros durante o prazo deste Contrato, e (ii) o recebimento pela TS da integralidade da contraprestação devida prevista neste Contrato, observados os termos e condições deste Contrato, durante todo o período contratado, para que assim possa ter o retorno do investimento feito;

(xii)      as Partes declaram que a celebração deste Contrato como um contrato atípico e complexo foi acordada como a única forma de, efetiva e legalmente, materializar e formalizar juridicamente a relação que as Partes visam estabelecer entre si, constituindo, por conseguinte, as disposições atípicas aqui previstas, condições necessárias e essenciais à implementação do negócio jurídico aqui previsto e ao equilíbrio econômico-financeiro do presente Contrato;

(xiii)     as Partes declaram que as condições atípicas deste Contrato foram estabelecidas de boa-fé, conforme o disposto no artigo 422 do Código Civil Brasileiro, e com respeito a função social do contrato, conforme o disposto no artigo 421 do Código Civil Brasileiro; e

(xiv)     não existe subordinação econômica e/ou hipossuficiência entre as Partes, que optaram livremente por estruturar o presente negócio de acordo com as condições aqui ajustadas.

**RESOLVEM** celebrar, na melhor forma de direito, o presente Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças ("Contrato"), que se regerá pelas seguintes cláusulas e condições:

**CLÁUSULA I.**        **DAS DEFINIÇÕES**

**1.1.**     A não ser que diferentemente previsto neste Contrato, os termos utilizados em letra maiúscula ou iniciados em letra maiúscula terão o respectivo significado abaixo definido, conforme aplicável:



Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

| | |
|---|---|
| "ABNT" | tem o significado que lhe é atribuído na Cláusula 4.2.1 deste Contrato. |
| "Aditamento de Admissão do Terceiro Adquirente" | tem o significado que lhe é atribuído na Cláusula 16.8.(i) deste Contrato. |
| "Afiliada" | tem o significado que lhe é atribuído na Cláusula 12.3.1 deste Contrato. |
| "Aluguel Uso Próprio" | tem o significado que lhe é atribuído na Cláusula 15.2.1 deste Contrato. |
| "ANEAS" | tem o significado que lhe é atribuído no Preâmbulo deste Contrato. |
| "Área Construída Existente" | tem o significado que lhe é atribuído no Considerando (iii) deste Contrato. |
| "Área Construída Total" | tem o significado que lhe é atribuído no Considerando (iii) deste Contrato. |
| "AVCB" | tem o significado que lhe é atribuído na Cláusula 4.4 deste Contrato. |
| "Cessão Fiduciária dos Recebíveis" | Tem o significado que lhe é atribuído na Cláusula 9.2 deste Contrato. |
| "CND-INSS" | tem o significado que lhe é atribuído na Cláusula 4.4 deste Contrato. |
| "CND-ISS" | tem o significado que lhe é atribuído na Cláusula 4.4 deste Contrato. |
| "Código Civil Brasileiro" | significa a Lei Federal n. 10.406, de 10 de janeiro de 2002, conforme alterada. |
| "Código de Processo Civil Brasileiro" | significa a Lei Federal n. 13.105, de 16 de março de 2015, conforme alterada. |
| "Colégio São Luís" | tem o significado que lhe é atribuído no Considerando (v) deste Contrato. |
| "Complemento de Investimento" | tem o significado que lhe é atribuído na Cláusula 8.9 deste Contrato. |
| "Condições Suspensivas" | tem o significado que lhe é atribuído na Cláusula 7.1 deste Contrato. |
| "Conjunto São Luís" | tem o significado que lhe é atribuído no Considerando (viii) deste Contrato. |

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

| | |
|---|---|
| "Contrato" | tem o significado que lhe é atribuído no Preâmbulo deste Contrato. |
| "Construtora" | tem o significado que lhe é atribuído na Cláusula 4.2 deste Contrato. |
| "Controle" | significa a titularidade (direta ou indireta) de direitos de sócio ou acionista, detidos individualmente ou em conjunto com um grupo de pessoas físicas e/ou jurídicas vinculadas por acordo de voto ou sob controle comum, que assegurem, direta ou indiretamente: (i) a maioria dos votos nas deliberações da assembleia geral ou órgão deliberativo similar; e (ii) o poder de eleger a maioria dos membros da diretoria ou outro órgão deliberativo superior, conforme o caso, de uma determinada pessoa, seja por força de participação societária, por contrato ou qualquer outro meio. Deverão ser interpretados em consonância com a definição de Controle termos que derivem do mesmo radical, tais como "Controlem", "Controladas", "Controla", "Controlador", etc. |
| "Data de Eficácia da Rescisão" | tem o significado que lhe é atribuído na Cláusula 17.9.2 deste Contrato. |
| "Data Efetiva de Conclusão" | tem o significado que lhe é atribuído na Cláusula 8.1.8 deste Contrato. |
| "Decisão da Arbitragem dos Investimentos" | tem o significado que lhe é atribuído na Cláusula 8.9.3 deste Contrato |
| "Direito de Preferência" | tem o significado que lhe é atribuído na Cláusula 16.3 deste Contrato. |
| "Disposições da Política Anticorrupção" | tem o significado que lhe é atribuído na Cláusula 18.1.(x) deste Contrato. |
| "Documentos de Comprovação dos Investimentos" | tem o significado que lhe é atribuído na Cláusula 8.9.1 deste Contrato. |
| "Empresa de Avaliação" | tem o significado que lhe é atribuído na Cláusula 10.7 deste Contrato. |
| "Equipes" | tem o significado que lhe é atribuído na Cláusula 17.13 deste Contrato. |
| "Fiscalizadora" | tem o significado que lhe é atribuído na Cláusula 4.3 deste Contrato. |

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

| | |
|---|---|
| "Fluxo Financeiro" | tem o significado que lhe é atribuído na Cláusula 8.1.1 deste Contrato. |
| "Fundo" | tem o significado que lhe é atribuído na Cláusula 12.3 deste Contrato. |
| "Fundo de Reformas" | tem o significado que lhe é atribuído na Cláusula 5.4 deste Contrato. |
| "Gerenciadora" | tem o significado que lhe é atribuído na Cláusula 8.1.11 deste Contrato. |
| "Grupo TS" | tem o significado que lhe é atribuído no Preâmbulo deste Contrato. |
| "Habite-se" | tem o significado que lhe é atribuído na Cláusula 4.4 deste Contrato. |
| "Hipoteca CSL" | tem o significado que lhe é atribuído na Cláusula 9.1 deste Contrato |
| "ICC" | significa a Câmara de Comércio Internacional. |
| "Igreja São Luís" | tem o significado que lhe é atribuído no Considerando (v) deste Contrato. |
| "Imóvel" | tem o significado que lhe é atribuído no Considerando (ii) deste Contrato. |
| "INCC" | significa o Índice Nacional de Custo da Construção, publicado pela Fundação Getúlio Vargas. |
| "Indenização ANEAS-TS" | tem o significado que lhe é atribuído na Cláusula 10.5 deste Contrato. |
| "Indenização TS-ANEAS" | tem o significado que lhe é atribuído na Cláusula 10.5 deste Contrato. |
| "Índice Eleito" | significa a variação acumulada do IGP-M/FGV, ou, na falta deste, o pertinente índice de correção que esteja sendo adotado, no ano imediatamente anterior ao ano de vigência do Contrato em questão, como índice de correção para os contratos de locação do Conjunto São Luís que, em conjunto, representem maior área locável do Conjunto São Luís, independentemente do tamanho absoluto de tal área. |
| "Informações Confidenciais" | tem o significado que lhe é atribuído na Cláusula 13.1 deste Contrato. |
| "INMET" | significa o Instituto Nacional de Meteorologia. |

| | |
|---|---|
| "Investimento Realizado" | tem o significado que lhe é atribuído na Cláusula 10.5 deste Contrato. |
| "Investimentos no Reposicionamento Comercial" | tem o significado que lhe é atribuído na Cláusula 8.8 deste Contrato. |
| "Leis Anticorrupção" | tem o significado que lhe é atribuído na Cláusula 18.1.(i) deste Contrato. |
| "Locações Existentes" | tem o significado que lhe é atribuído no Considerando (iv) deste Contrato. |
| "Mandatos" | tem o significado que lhe é atribuído na Cláusula 2.3 deste Contrato |
| "Matrícula" | tem o significado que lhe é atribuído no Considerando (ii) deste Contrato. |
| "Minuta do Contrato de Construção" | tem o significado que lhe é atribuído na Cláusula 4.2 deste Contrato. |
| "Minuta Procuração A" | tem o significado que lhe é atribuído na Cláusula 2.3.1 deste Contrato. |
| "Minuta Procuração B" | tem o significado que lhe é atribuído na Cláusula 2.3.2 deste Contrato. |
| "Multa Compensatória" | tem o significado que lhe é atribuído na Cláusula 10.5 deste Contrato. |
| "Notificação de Alteração de Controle" | tem o significado que lhe é atribuído na Cláusula 17.9 deste Contrato. |
| "Notificação de Confirmação de Alteração de Controle" | tem o significado que lhe é atribuído na Cláusula 17.9.2 deste Contrato. |
| "Notificação de Direito de Preferência" | tem o significado que lhe é atribuído na Cláusula 16.4 deste Contrato. |
| "Notificação de Discordância" | tem o significado que lhe é atribuído na Cláusula 8.9.2 deste Contrato. |
| "Notificação de Não Superação das Condições Suspensivas" | Tem o significado que lhe é atribuído na Cláusula 7.3 deste Contrato. |

| | |
|---|---|
| "Notificação de Rejeição" | tem o significado que lhe é atribuído na Cláusula 12.3 deste Contrato. |
| "Notificação de Rescisão" | tem o significado que lhe é atribuído na Cláusula 12.3 deste Contrato. |
| "Notificação dos Investimentos" | tem o significado que lhe é atribuído na Cláusula 8.9.1 deste Contrato |
| "Novo Plano" | Tem o significado que lhe é atribuído na Cláusula 3.3.2 deste Contrato. |
| "Obras de Melhoria e Readequação" | tem o significado que lhe é atribuído no Considerando (x) deste Contrato. |
| "Oferta de Aquisição" | tem o significado que lhe é atribuído na Cláusula 16.4 deste Contrato. |
| "Oferta Vinculante TS" | tem o significado que lhe é atribuído na Cláusula 16.5 deste Contrato. |
| "Ônus Existentes" | tem o significado que lhe é atribuído na Cláusula 10.2.(iv) deste Contrato. |
| "Parte Declarante" | tem o significado que lhe é atribuído na Cláusula 18.1 deste Contrato. |
| "Parte Divulgadora" | tem o significado que lhe é atribuído na Cláusula 13.1 deste Contrato. |
| "Parte Receptora" | tem o significado que lhe é atribuído na Cláusula 13.1 deste Contrato. |
| "Partes" | tem o significado que lhe é atribuído no Preâmbulo deste Contrato. |
| "Participação ANEAS" | tem o significado que lhe é atribuído na Cláusula 8.1.5 deste Contrato. |
| "Perdas" | tem o significado que lhe é atribuído na Cláusula 14.3 deste Contrato. |
| "Plano de Negócios" | tem o significado que lhe é atribuído no Considerando (x) deste Contrato. |
| "Plano de Negócios Ajustado" | tem o significado que lhe é atribuído na Cláusula 3.3.2.(iii) deste Contrato. |
| "Política de Locação" | Tem o significado que lhe é atribuído na Cláusula 5.2 deste Contrato. |



"Porcentagem ANEAS"                         tem o significado que lhe é atribuído na Cláusula 8.1.5 deste Contrato.

"Porcentagem TS"                            tem o significado que lhe é atribuído na Cláusula 8.1.3 deste Contrato.

"Prazo de Apuração"                         tem o significado que lhe é atribuído na Cláusula 8.1.12 deste Contrato.

"Prazo de Investimento"                     tem o significado que lhe é atribuído na Cláusula 8.8 deste Contrato.

"Prazo do Contrato"                         tem o significado que lhe é atribuído na Cláusula 6.1 deste Contrato.

"Prazo Estimado para Conclusão das Obras"   tem o significado que lhe é atribuído na Cláusula 4.5 deste Contrato.

"Prazo Estimado Final da Readequação"       tem o significado que lhe é atribuído na Cláusula 8.1.7 deste Contrato.

"Prazo Inicial"                             tem o significado que lhe é atribuído na Cláusula 8.1.8 deste Contrato.

"Projetos"                                  tem o significado que lhe é atribuído na Cláusula 3.1.1 deste Contrato.

"Projeto de Reforma"                        tem o significado que lhe é atribuído na Cláusula 3.3.2.(iii) deste Contrato

"Projeto Modificativo"                      tem o significado que lhe é atribuído na Cláusula 3.2 deste Contrato

"Projeto Novo CSL"                          tem o significado que lhe é atribuído no Considerando (x) deste Contrato.

"Remuneração pela Administração"            tem o significado que lhe é atribuído na Cláusula 5.3.1 deste Contrato.

"Remuneração TS"                            tem o significado que lhe é atribuído na Cláusula 8.1.3 deste Contrato.

"Remuneração TS Estimada Mensal"            tem o significado que lhe é atribuído na Cláusula 10.6 deste Contrato.

"Reposicionamento Comercial"                tem o significado que lhe é atribuído no Considerando (x) deste Contrato.



| | |
|---|---|
| "Representantes" | significa empregados, prepostos, representantes, diretores, conselheiros e agentes da pessoa em questão. |
| "Resposta à Notificação de Preferência" | tem o significado que lhe é atribuído na Cláusula 16.5 deste Contrato. |
| "TED" | tem o significado que lhe é atribuído na Cláusula 8.4 deste Contrato. |
| "Terceira Empresa de Avaliação" | tem o significado que lhe é atribuído na Cláusula 10.7.4 deste Contrato. |
| "Terceiro Adquirente" | tem o significado que lhe é atribuído na Cláusula 16.8 deste Contrato. |
| "Termo de Aceitação dos Documentos de Comprovação dos Investimentos" | tem o significado que lhe é atribuído na Cláusula 8.9.4 deste Contrato. |
| "Termo de Entrega e Aceitação" | tem o significado que lhe é atribuído na Cláusula 4.7 deste Contrato. |
| "Tribunal Arbitral" | tem o significado que lhe é atribuído na Cláusula 19.1 deste Contrato. |
| "TS" | tem o significado que lhe é atribuído no Preâmbulo deste Contrato. |
| "TS Administradora" | tem o significado que lhe é atribuído no Preâmbulo deste Contrato. |
| "TS Gestora" | tem o significado que lhe é atribuído no Preâmbulo deste Contrato. |
| "Valor Mínimo 1" | tem o significado que lhe é atribuído na Cláusula 8.9 deste Contrato. |
| "Valor Mínimo 2" | tem o significado que lhe é atribuído na Cláusula 8.9 deste Contrato. |

## CLÁUSULA II.      DO OBJETO

2.1.      Constituem o objeto deste Contrato, único, indivisível e indissociável, embora composto de diversos itens: (i) a adequação e o reenquadramento do Conjunto São Luís; (ii) a realização das Obras de Melhoria e Readequação do Conjunto São Luís, sob a gestão exclusiva da TS; e (iii) a gestão, também pela TS, do Reposicionamento Comercial do Conjunto São Luís pelo prazo adiante previsto, todo este objeto a ser executado em observância ao Plano de Negócios, sendo certo que as



prestações abaixo descritas constituem um objeto único, indivisível e indissociável, para o propósito de formação e manutenção do sinalagma contratual e consecução da avença pretendida pelas Partes:

(i)     estruturação do projeto de adequação e reenquadramento do Conjunto São Luís, a serem desenvolvidos e executados pela TS, sob sua exclusiva responsabilidade e expensas, conforme detalhado no Plano de Negócios;

(ii)    condução pela TS dos procedimentos de aprovação das Obras de Melhoria e Readequação junto à Prefeitura de São Paulo;

(iii)   provisão pela TS dos recursos necessários para a consecução das Obras de Melhoria e Readequação;

(iv)    gestão pela TS das Obras de Melhoria e Readequação;

(v)     assunção e provisão pela TS da gestão comercial e de *marketing* visando ao Reposicionamento Comercial do Conjunto São Luís; e

(vi)    assunção, pela TS, da administração predial do Conjunto São Luís.

**2.2.**     As Partes expressamente reconhecem: (i) o caráter atípico e complexo deste Contrato; (ii) que este Contrato reúne prestações diversas e que não são, combinadamente, reconduzíveis a um único tipo contratual; e (iii) que o equilíbrio econômico-financeiro e sinalagma deste Contrato pressupõem que as relações jurídicas por este engendradas são indivisíveis e indissociáveis entre si, configurando um todo único.

**2.3.**     A ANEAS, por este Contrato, observada a superação das Condições Suspensivas, e por meio dos instrumentos de mandato, em caráter irrevogável e irretratável, enquanto estiver vigente este Contrato e como condição deste Contrato, nos termos do Artigo 684 do Código Civil Brasileiro, a serem outorgados em forma pública, nos termos do Anexo 2.3.1 e Anexo 2.3.2 deste Contrato, em até 10 (dez) dias úteis contados da superação das Condições Suspensivas ("Mandatos"), nomeará e constituirá a TS como sua mandatária para os fins adiante delineados: (i) aprovação das Obras de Melhoria e Readequação junto à municipalidade de São Paulo e aos demais órgãos governamentais competentes; (ii) representação da ANEAS junto ao Cartório de Registro de Imóveis competente para fins de averbação da Área Construída Total do Conjunto São Luís, se aplicável; (iii) deliberar em assembleia ou assembleias condominiais a contratação da TS Administradora como administradora predial do Conjunto São Luís; e (iv) locação do Conjunto São Luís, observados os termos do Plano de Negócios e as condições previstas neste Contrato.

2.3.1.   Os poderes de representação referidos nos itens (i) e (ii) da Cláusula 2.3 acima serão outorgados pela ANEAS à TS por meio de mandato, com prazo de 5 (cinco) anos, contados da data de superação das Condições Suspensivas, extensível por períodos adicionais e sucessivos de 1 (um) ano até a emissão do Termo de Recebimento Definitivo das Obras de que trata o Contrato de Construção, nos termos do instrumento de procuração reproduzido no Anexo 2.3.1 ("Minuta Procuração A").

2.3.2.   Os poderes de representação referidos nos itens (iii) e (iv) da Cláusula 2.3 acima serão outorgados pela ANEAS à TS por meio de mandato, pelo prazo de 50 (cinquenta) anos, contados da data de superação das Condições Suspensivas, nos termos do instrumento de procuração reproduzido no Anexo 2.3.2 ("Minuta Procuração B").

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

2.3.3. Os instrumentos de mandato referidos nas Cláusulas 2.3, 2.3.1 e 2.3.2 acima conterão, ainda, cláusula de substabelecimento, na hipótese de a TS utilizar, sob sua exclusiva responsabilidade e expensas, serviços de terceiros para a consecução dos objetos dos mandatos.

2.3.4. A nomeação contida na Cláusula 2.3.2 acima, e que será ratificada por mandato específico, é feita pela ANEAS em caráter de exclusividade, não podendo a ANEAS outorgar poderes semelhantes a quaisquer terceiros em relação ao Imóvel e/ou ao Conjunto São Luís, no todo ou em parte, em maior ou menor extensão que os poderes conferidos por meio deste Contrato, exceto se de outra forma requerido especificamente pela TS no exercício da sua faculdade de substabelecimento na forma da Cláusula 2.3.3 acima.

**2.4.** Não obstante o disposto na Cláusula 2.3 acima, a ANEAS compromete-se a participar como interveniente anuente nos contratos e atos jurídicos que a TS venha a celebrar e praticar para cumprir as obrigações assumidas pela TS no presente Contrato, sempre que solicitado pela TS, sendo certo que a ANEAS não poderá negar irrazoavelmente e imotivadamente sua interveniência e anuência.

## CLÁUSULA III. DOS PROCEDIMENTOS DE APROVAÇÃO

**3.1.** A TS será a responsável, às suas expensas, pela condução da aprovação dos projetos modificativos ou de reforma do Conjunto São Luís junto à Prefeitura de São Paulo e aos demais órgãos governamentais competentes, arcando ainda a TS com os custos e despesas da aprovação dos projetos modificativos ou de reforma do Conjunto São Luís.

3.1.1. Os projetos das Obras de Melhoria e Readequação serão elaborados por arquitetos e projetistas contratados pela TS, em benefício da ANEAS, em consonância com o disposto no Plano de Negócios ("Projetos").

3.1.2. Os Projetos deverão ser concluídos em um prazo de até 12 (doze) meses contados da data de superação das Condições Suspensivas, devendo a TS apresentá-los para a ANEAS previamente ao seu protocolo junto à Prefeitura de São Paulo, sendo certo ainda que a ANEAS somente poderá solicitar alterações nos Projetos na hipótese de comprovada divergência entre o seu conteúdo e o conteúdo do Plano de Negócios.

3.1.3. Na hipótese de a ANEAS, em um prazo de até 30 (trinta) dias contados da apresentação dos Projetos pela TS, identificar divergências entre o seu conteúdo e o Plano de Negócios, a TS terá um prazo de até 30 (trinta) dias para: (i) endereçar os itens levantados pela ANEAS e ajustar os Projetos, de forma a refletir o Plano de Negócios; ou (ii) rejeitar fundamentadamente as divergências indicadas pela ANEAS.

3.1.4. Na hipótese de a ANEAS não se manifestar no prazo de até 30 (trinta) dias previsto na Cláusula 3.1.3 supra, serão considerados como tacitamente aceitos os Projetos apresentados pela TS.

3.1.5. Uma vez apresentados pela TS à ANEAS os Projetos revisados, ou ainda, a fundamentação de rejeição das divergências então levantadas pela ANEAS, as Partes





Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

terão um prazo de até 30 (trinta) dias para acordar a nova e definitiva versão dos Projetos. Caso as Partes não acordem tal versão definitiva dos Projetos no referido prazo, as Partes deverão, em comum acordo, nos 30 (trinta) dias subsequentes ao término de tal prazo, contratar um terceiro *expert* entre empresas imobiliárias de reputação internacional com atuação comprovada na cidade de São Paulo, estado de São Paulo, que deverá arbitrar de forma a preservar as disposições do Plano Negócios, sobretudo no que tange à manutenção das premissas da perspectiva de rentabilidade do Conjunto São Luís.

3.1.6.   A escolha do *expert* referido na Cláusula 3.1.5 acima deverá evitar qualquer conflito de interesses, convencionando-se que tal terceiro *expert* não mantenha ou não tenha mantido nos últimos 24 (vinte e quatro) meses contrato ou relações comerciais com o Grupo TS ou com a ANEAS.

**3.2.**   Em um prazo de até 10 (dez) dias contados da definição dos Projetos, conforme disposto na cláusula acima, a TS, em benefício da ANEAS, deverá protocolar os Projetos como um projeto modificativo aos alvarás e certificados de conclusão/Habite-se descritos e caracterizados no Anexo (iii) deste Contrato junto à Prefeitura de São Paulo ("Projeto Modificativo"), devendo diligenciar e enviar seus melhores esforços com vistas à aprovação do Projeto Modificativo, no menor prazo possível, dentro de 24 (vinte e quatro) meses contados da data do respectivo protocolo.

3.2.1.   Toda e qualquer exigência que a Prefeitura de São Paulo eventualmente formule durante a análise do Projeto Modificativo deverá ser atendida prontamente pela TS e comunicada pela TS à ANEAS, sendo certo que, caso a exigência se refira ao pagamento de contrapartida – a título de outorga onerosa ou qualquer outro título – aplicar-se-á o disposto na Cláusula 3.3.

3.2.2.   Se a exigência formulada pela Prefeitura de São Paulo afetar características ou elementos relevantes do Plano de Negócios, a TS deverá obter o assentimento da ANEAS antes de responder à exigência pertinente, na forma abaixo.

3.2.3.   Na hipótese de o assentimento da ANEAS ser necessário, a TS deverá apresentar solução para a ANEAS em um prazo de até 30 (trinta) dias contados da data em que efetivamente tomar conhecimento da exigência então formulada pela Prefeitura de São Paulo, seguindo-se a partir de então o mesmo procedimento da definição dos Projetos para a solução da exigência, conforme previsto na Cláusula 3.1.3 e seguintes acima.

**3.3.**   Outorga onerosa. Caso a Prefeitura de São Paulo exija, no âmbito da aprovação do Projeto Modificativo, pagamento de contrapartida – a título de outorga onerosa ou a outro título em função de alteração do uso do Conjunto São Luís de escola para uso comercial - em montante de até R$ 20.000.000,00 (vinte milhões de reais), o Plano de Negócios deverá ser mantido e a TS deverá pagar a contrapartida exigida pela Prefeitura de São Paulo.

3.3.1.   Caso o montante de contrapartida exigido pela Prefeitura de São Paulo a título de outorga onerosa ou a outro título em função de alteração do uso do Conjunto São Luís de escola para uso comercial seja superior a R$ 20.000.000,00 (vinte milhões de reais), a TS poderá optar por:

(i)   manter o Plano de Negócios e pagar a contrapartida exigida pela Prefeitura de São Paulo; ou

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

(ii)        não pagar a contrapartida e seguir o procedimento previsto na Cláusula 3.3.2 abaixo.

3.3.2.     Na hipótese prevista na Cláusula 3.3.1.(ii) acima, as Partes acordam que:

(i)         a TS, em um prazo de até 60 (sessenta) dias contados do conhecimento da exigência da contrapartida, deverá apresentar à ANEAS estudos do impacto da contrapartida exigida ao Plano de Negócios e alternativas para o financiamento da contrapartida, com um novo plano de negócios ("Novo Plano"), a ser discutido e, eventualmente, acordado entre TS e ANEAS, inclusive no que concerne ao suporte financeiro da contrapartida exigida, em um prazo de até 30 (trinta) dias contados da apresentação do Novo Plano pela TS à ANEAS;

(ii)        caso a TS e a ANEAS aprovem o Novo Plano no prazo supra previsto, as Partes deverão, na forma acima acordada, pagar a contrapartida conforme exigido pela Prefeitura de São Paulo; e

(iii)       caso a TS e a ANEAS não logrem acordar o Novo Plano até a expiração do prazo previsto na Cláusula 3.3.2.(i) acima:

            (iii.a)     o Plano de Negócios será ajustado, com base na premissa de que a área atualmente com destinação de uso educacional permanecerá com tal uso e as demais áreas terão uso comercial ("Plano de Negócios Ajustado");

            (iii.b)     a TS deverá revisar o Projeto Modificativo, com base no Plano de Negócios Ajustado, e ingressar junto à Prefeitura de São Paulo com um projeto de reforma que evite a exigência do pagamento de contrapartida, a título de outorga onerosa ou outro título ("Projeto de Reforma"); e

            (iii.c)     observado o disposto no item (iii.b) acima, a TS buscará instituições de ensino de alto padrão, inclusive internacionais, para locação da área destinada a uso educacional, aplicando-se o disposto na Cláusula 8.7 abaixo, devendo o referido uso educacional não contemplar de forma preponderante o ensino básico. No caso de o uso preponderante ser para ensino básico, tal uso somente será admitido mediante expresso e prévio consentimento da ANEAS que deverá analisar o pleito da TS de boa-fé.

**CLÁUSULA IV.          DA EXECUÇÃO DAS OBRAS DE MELHORIA E READEQUAÇÃO**

**4.1.**         Sem prejuízo do disposto na CLÁUSULA XII abaixo, a TS compromete-se a prover pela realização das Obras de Melhoria e Readequação do Conjunto São Luís com recursos próprios, assim entendidos recursos aportados por seus sócios a título de integralização de cotas representativas do capital social da TS, observado o Plano de Negócios (ou o Novo Plano ou o Plano de Negócios Ajustado, conforme o caso) e os Projetos, conforme sejam aprovados pela Prefeitura de São Paulo. Para fins de clareza, a ANEAS não possuirá qualquer responsabilidade patrimonial por financiar ou custear as Obras de Melhoria e Readequação do Conjunto São Luís.

**4.2.**         Visando ao cumprimento da obrigação de executar as Obras de Melhoria e Readequação, a TS, em até 90 (noventa) dias contados da data de aprovação dos Projetos pela Prefeitura de São Paulo, contratará uma construtora ("Construtora"), mediante processo de concorrência a ser conduzido pela TS, às suas exclusivas expensas e sob sua responsabilidade, para a execução das Obras



de Melhoria e Readequação, sendo certo que a TS fornecerá à ANEAS a lista de construtoras que manifestaram interesse em participar da concorrência, quando será facultado à ANEAS, desde que motivadamente, vetar quaisquer das construtoras habilitadas, caso a ANEAS evidencie que a referida construtora não possui a devida idoneidade ou capacidade para execução das Obras de Melhoria e Readequação do Conjunto São Luís. O contrato de construção que a TS firmará com a Construtora deverá conter, substancialmente, os mesmos termos e condições da minuta de contrato reproduzida no Anexo 4.2 ("Minuta do Contrato de Construção"), sendo certo que a ANEAS se obriga a participar como interveniente-anuente do referido contrato, na qualidade de proprietária do Conjunto São Luís, ou manifestar, em documento apartado endereçado à Construtora, sua plena aceitação quanto à realização das obras objetivadas no contrato de construção no Conjunto São Luís, porém sem qualquer responsabilidade da ANEAS perante a Construtora.

4.2.1.   As Obras de Melhoria e Readequação deverão ser executadas pela Construtora em respeito e observância às normas técnicas aprovadas pela Associação Brasileira de Normas Técnicas ("ABNT"), posturas e legislações municipais, estaduais e federais, incluindo, entre outras, normas de proteção ao meio ambiente e normas trabalhistas vigentes, além das disposições, termos e condições do Plano de Negócios (ou do Novo Plano ou do Plano de Negócios Ajustado, conforme o caso) e dos Projetos, consoante o disposto neste Contrato.

4.2.2.   A TS fará com que a Construtora tenha pleno conhecimento dos Projetos e também dos demais documentos pertinentes necessários à execução das Obras de Melhoria e Readequação, de forma que a Construtora execute as Obras de Melhoria e Readequação em consonância com os termos e condições aqui acordados, especialmente, mas não somente, as especificações e características dos Projetos e o Prazo Estimado para Conclusão das Obras, conforme previsto na Cláusula 4.5 abaixo.

**4.3.**   A execução das Obras de Melhoria e Readequação deverá se iniciar em até 180 (cento e oitenta) dias contados da data de emissão do pertinente alvará de execução pela Prefeitura de São Paulo, autorizando a execução das referidas Obras de Melhoria e Readequação, e será vistoriada por uma fiscalizadora, a ser contratada pela TS ("Fiscalizadora"), sendo que os respectivos honorários serão arcados pela TS.

4.3.1.   A ANEAS poderá igualmente vistoriar e acompanhar a execução das citadas obras, diretamente ou por meio de terceiro por ela contratado, cujos honorários serão arcados pela ANEAS.

4.3.2.   A vistoria e acompanhamento das obras supra referidas por parte da ANEAS ou de terceiro por ela contratado para tal fim não poderão ser interpretados de forma a atribuir à ANEAS qualquer responsabilidade sobre as citadas obras.

**4.4.**   Em consonância com o disposto na CLÁUSULA III acima, a TS deverá tomar as medidas necessárias com vistas à aprovação dos Projetos junto à Prefeitura de São Paulo e aos demais órgãos da administração pública, bem como será responsável pelo custeio dos emolumentos necessários para obtenção da Certidão Negativa de Débitos referente ao cadastro da Obra na CEI – INSS ("CND-INSS"), da Certidão Negativa de Débitos de ISS ("CND-ISS"), do Auto de Vistoria do Corpo de Bombeiros ("AVCB"), do Auto de Conclusão da Obra, no caso, das Obras de Melhoria e Readequação ("Habite-se") e, ainda, pela competente averbação da construção junto ao Cartório de Registro de Imóveis competente.

**4.5.**      O prazo estimado para a conclusão de cada uma das etapas das Obras de Melhoria e Readequação (que, para fins da estimativa, corresponde à emissão dos pertinentes Habite-se de cada uma das etapas relativas às Obras de Melhoria e Readequação) será aquele correspondente e referido no cronograma do Plano de Negócios (ou do Novo Plano ou do Plano de Negócios Ajustado, conforme o caso) ("<u>Prazo Estimado para Conclusão das Obras</u>").

**4.6.**      O Prazo Estimado para Conclusão das Obras poderá ser postergado ou prorrogado: (i) se ocorrerem motivos de força maior ou caso fortuito, nos termos da legislação então em vigor e conforme adiante discriminado no presente Contrato; (ii) se houver culpa ou atraso de órgãos públicos, ou concessionárias públicas, que retardem a emissão do Habite-se ou eventuais licenças necessárias a sua conclusão; ou (iii) por solicitação de alteração de qualquer projeto relacionado às Obras de Melhoria e Readequação por parte de qualquer órgão público, solicitação esta que, caso altere a substância das Obras de Melhoria e Readequação, deverá ser previamente aprovada pelas Partes, seguindo-se o mecanismo previsto na Cláusula 3.2.1 acima.

4.6.1.      Sem prejuízo do acima exposto, ficam definidos, desde já, como eventos caracterizadores de caso fortuito ou força maior:

(i)      chuvas acima da média histórica relacionadas à região de localização do Imóvel, segundo o Instituto Nacional de Meteorologia ("<u>INMET</u>"), e outras intempéries da natureza que, diretamente, impactem nas obras ou no fornecimento de material e/ou equipamentos necessários às obras;

(ii)      greves gerais ou parciais de funcionários federais, estaduais ou municipais, e ainda, da indústria da construção civil ou de alguma atividade que afete o andamento das Obras de Melhoria e Readequação, ou a emissão de alvarás e licenças, especialmente, mas não limitado ao Habite-se, mesmo que provisórios, que afetem as Obras de Melhoria e Readequação, e ainda qualquer tipo de manifestação, de qualquer cunho, seja ele, exemplificativamente, social, político econômico etc., que possa afetar, ou tenha o condão de afetar o acesso e o trânsito de veículos e pessoas na região em que se situa o Imóvel, desde que impactem nas obras ou no fornecimento de material e/ou equipamentos necessários às Obras de Melhoria e Readequação;

(iii)      demora dos portos, tais como greves, "operação padrão", congestionamento de tráfego e outras ocorrências que retardem a liberação de materiais importados, destinados à utilização ou colocação nas Obras de Melhoria e Readequação;

(iv)      estado de guerra ou perturbação da ordem pública que afete a realização das Obras de Melhoria e Readequação;

(v)      terremotos e outras intempéries similares da natureza que afetem a realização das Obras de Melhoria e Readequação;

(vi)      incêndios, explosões ou sinistros que impeçam a execução das Obras de Melhoria e Readequação ou afetem negativamente o seu ritmo, desde que tais incêndios, explosões ou sinistros não tenham sido causados pela TS, pela Construtora ou terceiros contratados pela TS ou pela Construtora;





(vii)     atraso das autoridades públicas e agências governamentais que afete o andamento das Obras de Melhoria e Readequação, ou a emissão de eventuais alvarás e licenças a elas pertinentes, e, especialmente, mas não somente, o Habite-se;

(viii)    decisões judiciais que determinem a paralisação, ou impeçam, no todo ou em parte, a execução das obrigações deste Contrato, desde que não resultantes de atos ou omissões das Partes; e

(ix)      alterações na legislação federal, estadual ou municipal que causem embaraços à execução das Obras de Melhoria e Readequação no prazo programado, desde que não haja plano alternativo viável e mutuamente acordado entre as Partes.

4.6.2.   Em qualquer caso, a TS deverá informar à ANEAS, tão logo quanto possível, sobre a existência de um fato ou ato qualificável como caso fortuito ou força maior, evidenciando que o fato ou ato ensejou o atraso em questão.

4.6.3.   A postergação ou prorrogação prevista na Cláusula 4.6 será, em qualquer hipótese, igual ao atraso causado pelo ato ou fato de força maior ou caso fortuito, acrescido do tempo necessário à regular retomada das Obras de Melhoria e Readequação.

**4.7.**     Ao final do Prazo Estimado Final da Readequação, a TS e a ANEAS elaborarão, de comum acordo, laudo definitivo correspondente a cada uma das etapas das Obras de Melhoria e Readequação do Conjunto São Luís, o qual será considerado como termo de entrega e aceitação das correspondentes e respectivas etapas das Obras de Melhoria e Readequação, conforme previsto na Minuta do Contrato de Construção ("Termo de Entrega e Aceitação").

**4.8.**     A TS deverá fazer com que a Construtora entregue cópia dos projetos *as built*, manual do proprietário e orientações de manutenção do Conjunto São Luís, assim como todas as licenças e aprovações referentes à execução de cada etapa das Obras de Melhoria e Readequação, se aplicável, em até 180 (cento e oitenta) dias da data de assinatura do Termo de Entrega e Aceitação atinente a cada uma das etapas das Obras de Melhoria e Readequação, conforme previsto na Minuta do Contrato de Construção.

## CLÁUSULA V.        DA GESTÃO IMOBILIÁRIA E DA ADMINISTRAÇÃO PREDIAL

**5.1.**     A partir da data de primeiro aniversário da data de superação das Condições Suspensivas e até o término do Prazo do Contrato, conforme definido na Cláusula 6.1 abaixo, a TS Gestora se tornará a única e exclusiva responsável pela gestão imobiliária do Conjunto São Luís e a TS Administradora se tornará a única e exclusiva responsável pela administração predial do Conjunto São Luís, conforme abaixo descritas, mediante a celebração do contrato de administração predial cuja minuta encontra-se reproduzida no Anexo 5.3.2, podendo exercer essas funções diretamente ou por meio de terceiros subcontratados pela TS. A data de início da gestão imobiliária e administração predial poderá ser antecipada, ao exclusivo critério da TS, mediante notificação por escrito da TS à ANEAS, com 65 (sessenta e cinco) dias de antecedência, pela qual TS Gestora e TS Administradora assumirão a gestão imobiliária e a administração predial do Conjunto São Luís.

**5.2.**     No desempenho das funções como gestora imobiliária das locações do Conjunto São Luís, caberá à TS Gestora, sempre observado o disposto na política de locação que integra o Plano de Negócios ("Política de Locação"):



Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

(i)      a definição de faixa de valor provável de mercado das unidades do Conjunto São Luís e que serão os parâmetros para as ações definidas na etapa de locação das unidades do Conjunto São Luís;

(ii)     a elaboração do material de *marketing* de locação adequado (folhetos, placas, anúncios etc.), exclusivos para o processo de locação das unidades do Conjunto São Luís;

(iii)    a coordenação e a condução do processo de locação das unidades do Conjunto São Luís;

(iv)    a apresentação de contrapropostas aos potenciais interessados na locação de unidades do Conjunto São Luís, buscando sempre a maximização dos valores de locação;

(v)     a gestão e a renegociação dos termos, das condições, e de todas as demais particularidades, como por exemplo, mas sem limitação de qualquer natureza, os reajustes pertinentes aos períodos revisionais de alugueres, atinentes às Locações Existentes; e

(vi)    a condução dos processos judiciais atinentes exclusivamente à locação das unidades do Conjunto São Luís.

5.2.1.   A TS será a única responsável pelas despesas em que incorrer no desempenho de suas funções de gestora imobiliária do Conjunto São Luís; sendo certo que, durante o Período Remuneratório 5, os custos de honorários advocatícios, assim como os custos processuais de eventuais processos judiciais atinentes exclusivamente à locação das unidades do Conjunto São Luís serão suportados na proporção da participação da TS e da ANEAS no Fluxo Financeiro, consoante previsto neste Contrato.

5.2.2.   O material de *marketing* para a exploração comercial do Conjunto São Luís deverá ser elaborado pela TS e submetido à aprovação da ANEAS, a qual deverá se manifestar aprovando ou rejeitando, desde que com justo motivo, tal material, dentro do prazo de 10 (dez) dias úteis contados do recebimento do referido material. Na hipótese de a ANEAS não se manifestar no referido prazo, o material elaborado pela TS e submetido à aprovação da ANEAS considerar-se-á como aprovado para fins deste Contrato.

5.2.3.   No desempenho de suas funções na gestão das locações, a TS deverá, durante toda a vigência do Contrato, observar as regras e princípios previstos na Política de Locação, sendo certo que a Política de Locação poderá ser alterada de tempos em tempos pela TS no intuito de buscar a melhor rentabilidade do Conjunto São Luís, mediante ciência prévia à ANEAS, que somente poderá rejeitar a modificação pretendida de forma motivada, evidenciando que a pretensão de alteração trará impacto negativo na rentabilidade do Conjunto São Luís.

5.2.4.   A TS deverá enviar semestralmente à ANEAS um relatório sobre as ações judiciais referidas na Cláusula 5.2.(vi), observado o disposto na Cláusula 5.2.5 abaixo.

5.2.5.   Para fins de clareza, toda e qualquer demanda, judicial ou extrajudicial, relativa ao Imóvel, mas que não se refira exclusivamente à locação das unidades do Conjunto São Luís, deverão ser conduzidas pela ANEAS. Não obstante, na hipótese de a demanda, judicial ou extrajudicial, impactar as locações das unidades do Conjunto São Luís ou



ainda a rentabilidade do Conjunto São Luís, a ANEAS deverá diligenciar para que a TS tenha a faculdade de participar da demanda na qualidade de assistente da ANEAS e, caso não seja legalmente possível, a ANEAS deverá manter a TS informada sobre o andamento da demanda, assim como debater e acordar com a TS a estratégia processual para a demanda e sua condução, dando oportunidade à TS para opinar com relação à condução da demanda.

5.2.6.     Na hipótese de a TS Gestora originar novos contratos de locação para o Conjunto São Luís, sendo novos contratos de locação os contratos que venham a ser celebrados com locatários diversos daqueles existentes no Conjunto São Luís quando da celebração deste Contrato, a TS Gestora fará jus a uma remuneração correspondente a 1,2 (um inteiro e dois décimos) do valor do aluguel mensal contratado com referido locatário. Para fins desta cláusula, o aluguel mensal contratado corresponde à somatória da totalidade dos aluguéis que serão devidos pelo locatário ao longo do contrato de locação, considerando eventuais períodos de carência e descontos acordados, dividido pelo prazo do contrato de locação.

5.2.7.     Nos mesmos termos previstos para a TS Gestora, na hipótese de a ANEAS também originar novos contratos de locação para o Conjunto São Luís com locatários diversos daqueles que ora locam o Conjunto São Luís, a ANEAS também fará jus a uma remuneração correspondente a 1,2 (um inteiro e dois décimos) do valor do aluguel mensal contratado com referido locatário, a ser apurado na mesma forma prevista na Cláusula 5.2.6 acima.

5.2.8.     Caso a TS Gestora origine um novo contrato de locação para o Conjunto São Luís em colaboração com uma intermediadora terceira contratada para a locação do Conjunto São Luís, a remuneração global da intermediadora terceira e da TS Gestora deverá corresponder a 2 (dois) aluguéis mensais do contrato de locação respectivo, apurados na mesma forma prevista na Cláusula 5.2.6.

**5.3.**     A TS Administradora será a responsável pela administração predial do Conjunto São Luís, cabendo à TS Administradora realizar:

(i)      os serviços gerais de administração predial;

(ii)     os serviços gerais de escopo técnico, englobando a gestão administrativa, a gestão contábil e financeira, o gerenciamento operacional, a gestão de contratos de terceiros e suprimentos, a gestão de recursos das áreas comuns, a gestão da segurança, a gestão de consumos com utilidades e a elaboração de relatórios gerenciais; e

(iii)    a realização de programas de auditoria.

5.3.1.     A TS Administradora será remunerada no desempenho de sua função de administradora predial do Conjunto São Luís em um montante mensal equivalente a 7% (sete por cento) das despesas condominiais do Condomínio São Luís ("Remuneração pela Administração").

5.3.2.     A Remuneração pela Administração e os serviços de responsabilidade da TS Administradora encontram-se devidamente descritos e caraterizados na minuta de contrato de administração predial que constitui o Anexo 5.3.2 deste Contrato.

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

5.3.3.   A Remuneração pela Administração será paga por meio das taxas condominiais pagas pelos condôminos e/ou responsáveis.

5.3.4.   A Remuneração pela Administração poderá ser revista pelas Partes, a cada 10 (dez) anos, para adequá-la a eventuais novos parâmetros de mercado, considerando o padrão de posicionamento do Conjunto São Luís em função das Obras de Melhoria e Readequação.

5.3.5.   TS e ANEAS acordam expressamente que a eventual rescisão do contrato de administração predial, nos termos previstos na minuta que constitui o Anexo 5.3.2. deste Contrato, não implicará a rescisão deste Contrato e sequer acarretará qualquer impacto nos termos e condições previstos neste Contrato, incluindo, sem se limitar, na Remuneração TS.

**5.4.**   As Partes convencionam, ainda, que, no 42º (quadragésimo segundo) ano de vigência do presente Contrato, TS e ANEAS deverão elaborar um laudo referente ao Conjunto São Luís para determinar (i) as eventuais reformas necessárias para reposição do Conjunto São Luís às condições de entrega previstas na Cláusula 11.1 deste Contrato quando do encerramento do prazo de 50 (cinquenta) anos de vigência deste Contrato e (ii) o percentual a ser retido das receitas mensais resultantes da exploração do Conjunto São Luís para a execução dessas reformas, limitado a 5% (cinco por cento) de tais receitas, e que será destinado a um fundo específico com tal finalidade ("Fundo de Reformas"), observado o disposto abaixo.

5.4.1.   A retenção para constituição do Fundo de Reformas deverá ser feita a partir do 43º (quadragésimo terceiro) ano de vigência do presente Contrato e até que o Fundo de Reformas apresente um saldo equivalente ao valor necessário à completa execução das reformas citadas na Cláusula 5.4.

5.4.2.   Após a conclusão das reformas supra referidas, caso remanesça qualquer valor no Fundo de Reformas, esse valor deverá ser distribuído entre TS e ANEAS respeitando-se a proporção de participação da TS e ANEAS no Fluxo Financeiro (definido na Cláusula 8.1.1 abaixo) no momento da distribuição, participação esta apurada nos termos da CLÁUSULA VIII abaixo.

5.4.3.   Os valores do Fundo de Reformas deverão ser aplicados em investimentos de renda fixa junto a instituições financeiras de primeira linha do Brasil, sendo que será facultado à TS (i) suspender a retenção quando entender existir recursos suficientes no Fundo de Reformas; ou (ii) sempre que identificar excesso de recursos no Fundo de Reformas, distribuir o valor excedente para si e para a ANEAS, conforme o caso, respeitando-se a proporção de participação da TS e ANEAS no Fluxo Financeiro (definido na Cláusula 8.1.1 abaixo) no momento da distribuição, participação esta apurada nos termos da Cláusula 8.1.3 abaixo.

5.4.4.   Quaisquer reformas que as Partes venham a acordar nos termos da Cláusula 5.4.2 acima para a entrega do Conjunto São Luís nos termos da Cláusula 11.1 abaixo deverão ser realizadas exclusivamente com recursos disponíveis do Fundo de Reformas. Na hipótese de o valor das reformas que venham a ser acordadas para entrega do Conjunto São Luís superar o valor do Fundo de Reformas, as Partes acordam que os referidos investimentos ou reformas deverão ser adequados de forma a ficarem limitados ao valor disponível do Fundo de Reformas.



Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

## CLÁUSULA VI.          DO PRAZO DE VIGÊNCIA DO CONTRATO

**6.1.**        O presente Contrato é válido a partir da data de sua assinatura, e vigerá pelo prazo de 50 (cinquenta) anos contados da data de superação das Condições Suspensivas ("Prazo do Contrato").

**6.2.**        A ANEAS expressamente reconhece que o prazo de vigência mencionado na Cláusula 6.1 supra é uma condição essencial do presente Contrato, e que a manutenção da vigência do presente Contrato pelo referido prazo é condição basilar para a manutenção do equilíbrio-econômico entre ela e a TS, e por conseguinte, consiste em condição indispensável por causa da qual a TS aceitou celebrar a presente avença.

## CLÁUSULA VII.          DAS CONDIÇÕES SUSPENSIVAS

**7.1.**        Nos termos do artigo 125 do Código Civil Brasileiro, a eficácia do presente Contrato fica condicionada, de forma suspensiva, às seguintes condições ("Condições Suspensivas"):

(i)          confirmação, por parte da ANEAS, por escrito, da aprovação do presente instrumento pela *Curia Generalizia della Compagnia di Gesù*, com sede em Roma, Itália; e

(ii)          confirmação, por parte da TS, por escrito, da aprovação do presente instrumento pelo seu Comitê de Investimentos, com sede em Nova York, Estados Unidos.

**7.2.**        As Condições Suspensivas deverão ser implementadas no prazo de até 120 (cento e vinte) dias contados da assinatura do presente Contrato.

**7.3.**        Na hipótese de qualquer das Condições Suspensivas não ser implementada no prazo acima mencionado, qualquer das Partes poderá resolver o presente Contrato, mediante notificação por escrito à outra ("Notificação de Não Superação das Condições Suspensivas"), hipótese em que nenhuma espécie de multa, indenização, penalidade, ressarcimento ou reembolso será devido de Parte a Parte em função de tal resolução.

## CLÁUSULA VIII.          DO PREÇO E DAS CONDIÇÕES DE PAGAMENTO

**8.1.**        A contrapartida à TS pela consecução do objeto do presente Contrato se dará por meio de participação da TS no fluxo financeiro mensal decorrente da exploração do Conjunto São Luís, conforme discriminado e definido adiante, durante o prazo de vigência do Contrato.

8.1.1.          Para fins deste Contrato, entende-se como fluxo financeiro mensal do Conjunto São Luís a receita bruta mensal total oriunda da exploração do Conjunto São Luís, deduzida exclusivamente das despesas referidas no Anexo 8.1.10 ("Fluxo Financeiro"), conforme vier a ser apurado pela TS, no âmbito do exercício de suas funções de gestora imobiliária do Conjunto São Luís, conforme disposto na CLÁUSULA V supra, e apresentado à ANEAS e à Gerenciadora até o dia 10 (dez) de cada mês.

8.1.2.          O Fluxo Financeiro mensal do Conjunto São Luís será apurado sempre com base na receita de caixa decorrente da exploração do Conjunto São Luís do mês imediatamente anterior, deduzidas as despesas referidas na Cláusula 8.1.1 acima. Deste modo e exemplificativamente, o Fluxo Financeiro mensal de janeiro deverá ser apurado até o dia



Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

10 de fevereiro, com base nas receitas auferidas e nas despesas incorridas no mês de janeiro, e assim sucessivamente nos meses subsequentes.

8.1.2.1.   A ANEAS terá um prazo de até 10 (dez) dias para contestar o Fluxo Financeiro mensal apresentado pela TS, mediante notificação por escrito justificada. No caso de contestação do Fluxo Financeiro, as Partes acordam que a Remuneração TS referente à parte controversa do Fluxo Financeiro mensal deverá ser retida pela Gerenciadora com relação à Remuneração TS do mês imediatamente seguinte até a solução da controvérsia.

8.1.2.2.   Em caso de controvérsia quanto à apuração do Fluxo Financeiro mensal, as Partes disporão de um prazo de até 30 (trinta) dias para sua solução, sendo que em caso de solução total ou parcial, a Remuneração TS decorrente da porção do Fluxo Financeiro mensal controversa solucionada será liberada pela Gerenciadora à TS ou à ANEAS, conforme o caso, em até 2 (dois) dias úteis da referida solução.

8.1.2.3.   Na hipótese de, expirado o prazo de 30 (trinta) dias supra, permanecer a controvérsia com relação a parte ou totalidade do Fluxo Financeiro mensal, a TS deverá, em um prazo de até 5 (cinco) dias úteis contados da expiração do prazo de 30 (trinta) dias supra previsto, apresentar à ANEAS uma lista tríplice de empresas de auditoria independente para solução da porção controversa do Fluxo Financeiro mensal, devendo a ANEAS escolher 1 (uma) das empresas indicadas na lista tríplice em até 5 (cinco) dias contados do recebimento da lista da TS; caso a ANEAS não opte por uma das empresas no prazo supra, a TS poderá escolher qualquer das empresas indicadas.

8.1.2.4   A solução da empresa de auditoria escolhida será final e vinculante para as Partes no que tange à porção controversa do Fluxo Financeiro mensal, sendo que na hipótese de se verificar ser devido pagamento da Remuneração TS decorrente da solução da porção do Fluxo Financeiro mensal controversa solucionada, a Remuneração TS será liberada pela Gerenciadora à TS ou à ANEAS, conforme o caso, em até 2 (dois) dias úteis da decisão da empresa de auditoria.

8.1.2.5.   Os custos da empresa de auditoria serão suportados pelas Partes proporcionalmente ao sucesso com relação à porção controversa do Fluxo Financeiro mensal; exemplificativamente, na hipótese de a empresa de auditoria não acatar 80% (oitenta por cento) dos valores contestados pela ANEAS, a ANEAS suportará 80% (oitenta por cento) do custo da empresa de auditoria e a TS 20% (vinte por cento) dos custos da empresa de auditoria, e vice-versa.

8.1.3.   A participação da TS no Fluxo Financeiro mensal ("Remuneração TS") variará de acordo com os diferentes períodos compreendidos dentro do prazo de vigência deste Contrato e discriminados abaixo ("Períodos Remuneratórios"):

| Período Remuneratório | Prazo | Participação da TS no Fluxo Financeiro |
|---|---|---|
| 1 | Início do Prazo do Contrato a 31 de agosto de 2020 | Inexistirá participação da TS no Fluxo Financeiro mensal. |
| 2 | de 1º de setembro de 2020 a 31 de agosto de | Todo e qualquer excedente ao Fluxo Financeiro mensal de R$ 4.700.000,00 (quatro milhões e |





Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

| Período Remuneratório | Prazo | Participação da TS no Fluxo Financeiro |
|---|---|---|
| | 2022 | setecentos mil reais). |
| 3 | de 1° de setembro de 2022 a 31 de agosto de 2024 | Todo e qualquer excedente ao Fluxo Financeiro mensal de R$ 5.000.000,00 (cinco milhões de reais). |
| 4 | de 1° de setembro de 2024 a 31 de agosto de 2029 | Todo e qualquer excedente ao Fluxo Financeiro mensal de R$ 5.200.000,00 (cinco milhões e duzentos mil reais). |
| 5 | de 1° de setembro de 2029 até o término do Prazo do Contrato | Porcentagem TS calculada sobre o Fluxo Financeiro mensal, nos termos do disposto na Cláusula 8.6 ("Porcentagem TS"). |

8.1.4.   A TS será responsável por suportar todos os tributos incidentes sobre o pagamento da Remuneração TS, mediante pagamento direto de referidos tributos pela TS ou ainda eventual retenção de tributos sobre a Remuneração TS pela ANEAS quando a lei assim exigir. Qualquer criação ou aumento de tributo ou contribuição que incida ou venha a incidir sobre a Remuneração TS deverá ser suportado exclusivamente pela TS.

8.1.5.   A participação da ANEAS no Fluxo Financeiro mensal ("Participação ANEAS") variará de acordo com os diferentes períodos compreendidos dentro do prazo de vigência deste Contrato e discriminados abaixo:

| Período Remuneratório | Prazo | Participação da ANEAS no Fluxo Financeiro |
|---|---|---|
| 1 | Início do Prazo do Contrato a 31 de agosto de 2020 | 100% (cem por cento) do Fluxo Financeiro reverterá exclusivamente para a ANEAS. |
| 2 | de 1° de setembro de 2020 a 31 de agosto de 2022 | R$ 4.700.000,00 (quatro milhões e setecentos mil reais) fixos e mensais. |
| 3 | de 1° de setembro de 2022 a 31 de agosto de 2024 | R$ 5.000.000,00 (cinco milhões de reais) fixos e mensais. |
| 4 | de 1° de setembro de 2024 a 31 de agosto de 2029 | R$ 5.200.000,00 (cinco milhões e duzentos mil reais) fixos e mensais. |
| 5 | de 1° de setembro de 2029 até o término do Prazo do Contrato | Porcentagem ANEAS sobre o Fluxo Financeiro mensal, nos termos da Cláusula 8.6 ("Porcentagem ANEAS"). |

8.1.6.   Os valores previstos nas tabelas acima (Cláusulas 8.1.3 e 8.1.5) serão corrigidos, a partir da data de celebração deste Contrato até a data de início de cada um dos Períodos Remuneratórios 2 a 5 e a partir do início do pertinente Período Remuneratório, anualmente, pelo Índice Eleito.

8.1.7.   O prazo estimado para a conclusão final das Obras de Melhoria e Readequação é 31 de agosto de 2029, ressalvado o disposto nas Cláusulas 4.6 e subitens ("Prazo Estimado Final da Readequação").

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

8.1.8.    Caso a conclusão final das Obras de Melhoria e Readequação ("Data Efetiva de Conclusão") ocorra após 31 de agosto de 2028, prazo este que poderá ser prorrogado nas hipóteses previstas nas Cláusulas 4.6 e subitens ("Prazo Inicial"), e antes do Prazo Estimado Final da Readequação, a ANEAS fará jus, a partir do Prazo Estimado Final da Readequação e durante um período equivalente ao prazo transcorrido entre o Prazo Inicial e a Data Efetiva de Conclusão, a título de Participação ANEAS, ao maior valor entre (i) a quantia mensal de R$ 5.200.000,00 (cinco milhões e duzentos mil reais), atualizada pelo Índice Eleito até o Prazo Final de Readequação; e (ii) a Participação ANEAS apurada na forma das outras cláusulas deste Contrato.

8.1.9.    Caso a Data Efetiva de Conclusão ocorra após o Prazo Estimado Final da Readequação, a ANEAS fará jus, a partir da data do Prazo Estimado Final da Readequação e durante um período de 12 (doze) meses contados da Data Efetiva de Conclusão, a título de Participação ANEAS, ao maior valor entre (i) a quantia mensal de R$ 5.200.000,00 (cinco milhões e duzentos mil reais), atualizada pelo Índice Eleito até a Data Efetiva de Conclusão; e (ii) a Participação ANEAS apurada na forma das outras cláusulas deste Contrato.

8.1.10.   O Anexo 8.1.10 contém uma memória de cálculo do Fluxo Financeiro.

8.1.11.   A receita bruta mensal total oriunda da exploração do Conjunto São Luís será depositada em conta bancária aberta pela ANEAS, em seu nome, específica e exclusivamente para este fim, e que será gerenciada e movimentada exclusivamente por uma empresa terceira escolhida de comum acordo entre a ANEAS e a TS ("Gerenciadora"), entre as empresas listadas no Anexo 8.1.11, que fará a apuração do Fluxo Financeiro e a sua divisão, consoante o disposto na Cláusula 8.1.3 acima, sendo ainda certo que ANEAS e TS poderão substituir a Gerenciadora a qualquer momento, mediante acordo mútuo.

8.1.11.1  O contrato a ser celebrado com a Gerenciadora deverá conter, pelo menos, (i) a definição da conta vinculada; (ii) a definição, consoante os termos e condições deste Contrato, da forma de repartição dos valores depositados na conta vinculada; (iii) previsão de que a conta vinculada somente poderá ser movimentada, em desacordo com as regras previstas neste Contrato, mediante autorização de ambas as Partes; (iv) condições de extinção da conta vinculada; (v) regras de aplicação financeira dos recursos que porventura fiquem depositados na conta vinculada; e (vi) condições de rescisão e prazo de vigência de tal contrato de custódia.

8.1.12.   Nas hipóteses contempladas nas Cláusulas 8.1.8 e 8.1.9, exclusivamente enquanto as Partes estiverem apurando qual será a Participação TS que será definida, nos termos das Cláusulas 8.6 e 8.8 abaixo, com base nos Investimentos no Reposicionamento Comercial (estes a serem apurados consoante as regras das Cláusulas 8.9.1 a 8.9.4) e até que (i) a ANEAS envie à TS o Termo de Aceitação dos Documentos de Comprovação dos Investimentos ou (ii) ocorra a Decisão da Arbitragem dos Investimentos, ou, ainda, (iii) expire o prazo previsto na Cláusula 8.9.4 abaixo sem que a ANEAS tenha encaminhado à TS a Notificação de Discordância, quando a ANEAS receber a Participação ANEAS mensal baseada na Porcentagem ANEAS, e não a quantia mensal de R$ 5.200.000,00 (cinco milhões e duzentos mil reais), atualizada na forma do disposto nas Cláusulas 8.1.8 e 8.1.9, o Fluxo Financeiro será repartido entre ANEAS e TS à razão de 55% (cinquenta e cinco por cento) e 45% (quarenta e cinco por cento), respectivamente ("Prazo de Apuração"). Após a ocorrência de qualquer dos eventos descritos nos itens (i), (ii) ou (iii) acima, caso a Porcentagem ANEAS e a Porcentagem TS (definidas pelas Partes de





Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

acordo com as Cláusulas 8.6 e 8.9) sejam diferentes das proporções de 55% (cinquenta e cinco por cento) e 45% (quarenta e cinco por cento), respectivamente, as Partes deverão compensar as eventuais diferenças nas respectivas participações nos Fluxos Financeiros dos meses subsequentes, em um limite de 10% (dez por cento) da pertinente participação da Parte por mês até que as Partes tenham recebido exatamente as quantias às quais fazem jus de acordo com as cifras da Porcentagem ANEAS e da Porcentagem TS apuradas na forma do disposto neste Contrato.

**8.2.**      A Remuneração TS deverá ser transferida pela Gerenciadora para conta de livre movimentação da TS (por conta e ordem da ANEAS) em até 5 (cinco) dias contados da apuração do Fluxo Financeiro mensal, isto é, a título exemplificativo, o Fluxo Financeiro mensal referente ao mês de janeiro deverá ser apurado pela TS e comunicado à ANEAS e à Gerenciadora até 10 de fevereiro, e o valor devido pela ANEAS à TS deverá ser pago até 15 de fevereiro, e assim sucessivamente nos meses subsequentes; sendo que o saldo deverá ser transferido para conta de livre movimentação da ANEAS.

**8.3.**      As Partes convencionam que, na hipótese de o Fluxo Financeiro mensal do Conjunto São Luís ser inferior ao montante de (i) R$ 4.700.000,00 (quatro milhões e setecentos mil reais) para qualquer mês do Período Remuneratório 2 (previsto na Cláusula 8.5 acima), (ii) R$ 5.000.000,00 (cinco milhões de reais) para qualquer mês do Período Remuneratório 3 (previsto na Cláusula 8.5 acima), e/ou (iii) R$ 5.200.000,00 (cinco milhões e duzentos mil reais) para qualquer mês do Período Remuneratório 4 (previsto na Cláusula 8.5 acima), devendo todos os valores acima citados ser corrigidos a partir da data de celebração deste Contrato pelo Índice Eleito, na forma do disposto na Cláusula 8.1.6 acima, a TS deverá pagar à ANEAS a eventual diferença entre os valores supra previstos e o Fluxo Financeiro mensal efetivamente apurado para o mês em questão, devendo tal pagamento ser feito pela TS à ANEAS até o dia 15 (quinze) do mês seguinte ao mês objeto da apuração em questão.

8.3.1.      Na hipótese de atraso no pagamento do eventual valor devido pela TS à ANEAS, e também de qualquer valor devido pela ANEAS à TS, na forma prevista na presente CLÁUSULA VIII, sobre o valor devido e em atraso incidirá multa de 2% (dois por cento), acrescido de correção monetária pelo IGP-M/FGV (ou, quando aplicável, pelo Índice Eleito) e juros moratórios de 1% (um por cento) ao mês, calculados *pro-rata-temporis*.

**8.4.**      Os pagamentos devidos à TS na forma deste Contrato deverão ser feitos na conta corrente de titularidade da TS, no Brasil, a ser por ela oportunamente indicada para a ANEAS, por meio de transferência eletrônica disponível ("<u>TED</u>"), servindo o comprovante de transferência, observada a efetiva disponibilização financeira dos valores transferidos, como prova de quitação do pertinente pagamento.

**8.5.**      Os pagamentos devidos à ANEAS na forma deste Contrato deverão ser feitos na conta corrente, no Brasil, a ser por ela oportunamente indicada à TS e à Gerenciadora, servindo o comprovante de transferência, observada a efetiva disponibilização financeira dos valores transferidos, como prova de quitação do pertinente pagamento.

**8.6.**      A Porcentagem TS e a Porcentagem ANEAS variarão de acordo com a quantia total que a TS dispender a título de Investimentos no Reposicionamento Comercial, conforme definido na Cláusula 8.8 abaixo, observada a programação abaixo ("<u>Programação Base de Remuneração</u>"), sendo os valores abaixo nominais e sem qualquer correção monetária:



Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

| Valor Total Dispendido pela TS em Investimentos no Reposicionamento, no Pagamento da Outorga Onerosa e/ou no Complemento de Investimento | Porcentagem TS | Porcentagem ANEAS |
|---|---|---|
| Entre R$ 360.000.000,01 e R$ 370.000.000,00 | 50% | 50% |
| Entre R$ 350.000.000,01 e R$ 360.000.000,00 | 47,5% | 52,5% |
| Entre R$ 310.000.000,00 e R$ 350.000.000,00 | 45% | 55% |
| Entre R$ 300.000.000,00 e R$ 309.999.999,99 | 42,5% | 57,5% |
| Entre R$ 290.000.000,00 e R$ 299.999.999,99 | 40% | 60% |

**8.7.** Caso seja implementado o Plano de Negócios Ajustado, nos termos da Cláusula 3.3.2, a ANEAS fará jus, a partir de 1º de setembro de 2029 e durante todo o Período Remuneratório 5 (conforme indicado na tabela aposta na Cláusula 8.1.5), a um fluxo mensal correspondente ao maior valor entre (i) a quantia mensal de R$ 5.200.000,00 (cinco milhões e duzentos mil reais), atualizada pelo Índice Eleito até 1º de setembro de 2029 e, a partir desta data, anualmente pelo Índice Eleito ou (ii) a quantia correspondente à Participação ANEAS no Fluxo Financeiro equivalente a 55% (cinquenta e cinco por cento).

8.7.1.  Sempre que a ANEAS, nos termos da Cláusula 8.7 acima, tiver direito a receber, a título de Participação ANEAS, a quantia mensal de R$ 5.200.000,00 (cinco milhões e duzentos mil reais), atualizada pelo Índice Eleito, a Remuneração TS em tal mês corresponderá às quantias do Fluxo Financeiro que excederem a cifra retro mencionada.

8.7.2.  Na hipótese da Cláusula 8.7.1 acima, caso o Fluxo Financeiro não seja suficiente para pagar a quantia mensal de R$ 5.200.000,00 (cinco milhões e duzentos mil reais) atualizada na forma do disposto na Cláusula 8.7. acima à ANEAS, devida a título de Participação ANEAS, a TS deverá, às suas expensas, complementar o valor do Fluxo Financeiro de modo a garantir que a ANEAS receba a quantia correspondente à cifra retro mencionada.

8.7.3.  Na hipótese da Cláusula 8.7.(ii) acima, a TS fará jus ao recebimento de uma remuneração correspondente a 45% (quarenta e cinco por cento) do Fluxo Financeiro.

**8.8.** Para os efeitos deste Contrato, considerar-se-ão investimentos no Reposicionamento Comercial do Conjunto São Luís ("Investimentos no Reposicionamento Comercial") todas e quaisquer despesas e custos efetuados e incorridos ou comprometidos pela TS entre a data de início do Prazo do Contrato e o Prazo Estimado Final da Readequação ("Prazo de Investimento"), para fins de implementação do Plano de Negócios (ou do Novo Plano ou do Plano de Negócios Ajustado, conforme o caso) e consecução das Obras de Melhoria e Readequação, incluindo o eventual valor da contrapartida paga pela TS à Prefeitura de São Paulo a título de outorga onerosa ou a outro título, devendo tais custos e despesas serem adequadamente refletidos em balanços anuais auditados da TS, conforme detalhado na Cláusula 8.8.2 abaixo.

8.8.1.  Os balanços anuais da TS, devidamente auditados, servirão como evidência dos custos e despesas incorridos com as Obras de Melhoria e Readequação.

8.8.2.  Compõem os Investimentos no Reposicionamento Comercial, 106% (cento e seis por cento) dos seguintes custos e despesas incorridos com as Obras de Melhoria e Readequação, inclusive os pertinentes a tributos e emolumentos incidentes, comprovados nos termos da Cláusula 8.8.1 acima, e observado o disposto na Cláusula 8.8.3 abaixo:

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

(i)     o eventual valor da contrapartida paga pela TS à Prefeitura de São Paulo a título de outorga onerosa ou a outro título, desde que estritamente relacionada ao Conjunto São Luís;

(ii)    custos incorridos para elaboração dos Projetos, desenhos e especificações técnicas necessárias para a implementação do Plano de Negócios (ou do Novo Plano ou do Plano de Negócios Ajustado, conforme o caso) e consecução das Obras de Melhoria e Readequação;

(iii)   custos incorridos para a obtenção dos alvarás e licenças necessárias para o desenvolvimento das Obras de Melhoria e Readequação e os custos incorridos com relação ao Habite-se, Auto de Vistoria de Corpo de Bombeiros, certidões de ISS e INSS e emolumentos necessários para sua conclusão, assim como os emolumentos e custos relativos ao Registro de Imóveis para averbação da construção e instituição condominial e retificação da incorporação imobiliária e instituição condominial ora vigente;

(iv)    custos efetivos das obras durante a fase de execução das Obras de Melhoria e Readequação;

(v)     custos com a divulgação do Conjunto São Luís;

(vi)    custos com empresas corretoras de imóveis, para a comercialização ou locação do Conjunto São Luís, desde que tais empresas corretoras de imóveis não façam parte do grupo econômico da TS e observado o limite de remuneração de 2 (duas) vezes o valor do aluguel mensal do imóvel objeto da corretagem em questão, apurado na forma prevista na Cláusula 5.2.6;

(vii)   custos com consultores em geral relacionados estritamente ao Conjunto São Luís e às Obras de Melhoria e Readequação;

(viii)  multas moratórias, multas compensatórias, honorários advocatícios, honorários periciais e todas e quaisquer custas incorridas no âmbito de processos administrativos e judiciais, desde que não decorrentes de negligência ou má-fé da TS; e

(ix)    a parcela de responsabilidade da TS das despesas consistentes nas taxas e emolumentos devidos em razão da lavratura do instrumento público de Hipoteca e do registro da Hipoteca e da Cessão Fiduciária dos Recebíveis nos competentes ofícios de cartórios, conforme previsto na Cláusula 9.4.

8.8.3.  Fica certo e ajustado que não compõem os Investimentos no Reposicionamento Comercial:

(i)     sem prejuízo do disposto na Cláusula 4.1, quaisquer valores relacionados a contratos de financiamento de qualquer espécie e afins que a TS venha a firmar, incluindo mas não se limitando a principal, juros, correção monetária e demais encargos financeiros similares;

(ii)    valores relacionados a (i.a) alocação de horas que os funcionários da TS ou que os funcionários de qualquer Afiliada à TS tenham despendido ou despenderem na execução

das atividades e obrigações da TS previstas neste Contrato, (i.b) rateio de despesas com a manutenção do escritório da TS, incluindo custos de ocupação (aluguel e condomínio), custos de comunicação (telefone, internet etc.), custos de informática, aluguel de equipamentos, seguros e impressões e materiais para escritório, (i.c) despesas incorridas com viagens dos funcionários da TS ocorridas com a execução deste Contrato, e (i.d) quaisquer outras despesas administrativas da TS, ainda que sejam intrínsecas ao desenvolvimento das Obras de Melhoria e Readequação e Reposicionamento Comercial do Conjunto São Luís;

(iii)    quaisquer tributos ou taxas incorridos pela TS relacionados ao recebimento de valores resultantes do presente Contrato;

(iv)    condenações, multas moratórias, multas compensatórias, honorários advocatícios, honorários periciais e todas e quaisquer custas incorridas no âmbito de processos administrativos e judiciais, bem como indenizações devidas por descumprimento de disposição contratual, desde que decorrentes de negligência ou má-fé da TS;

(v)    valores pagos a qualquer pessoa integrante do grupo econômico da TS, inclusive pagamentos relacionados a bônus, prêmios, bonificações, premiações e honorários de sucesso de qualquer espécie; e

(vi)    valores pagos em desacordo com práticas de mercado ou em violação da legislação aplicável.

**8.9.**    Na hipótese de (i) o Plano de Negócios (ou o Novo Plano, conforme o caso) ser totalmente implementado e os Investimentos no Reposicionamento Comercial somarem valor inferior a R$ 290.000.000,00 (duzentos e noventa milhões de reais), nominal e sem correção monetária ("Valor Mínimo 1") ou (ii) o Plano de Negócios Ajustado ser totalmente implementado e os Investimentos no Reposicionamento Comercial somarem valor inferior a R$ 175.000.000,00 (cento e setenta e cinco milhões de reais), nominal e sem correção monetária ("Valor Mínimo 2"), as Partes acordam que eventual diferença entre o valor dos Investimentos no Reposicionamento Comercial e o Valor Mínimo 1 ou o Valor Mínimo 2, conforme aplicável, deverá ser paga pela TS em favor da ANEAS com a utilização dos recursos da TS decorrentes da Remuneração TS ou outros recursos a qualquer outro título, em 12 (doze) parcelas mensais, iguais e sucessivas, sendo a primeira devida dentro de 90 (noventa) dias contados do recebimento, pela TS, do Termo de Aceitação dos Documentos de Comprovação dos Investimentos ("Complemento de Investimento").

8.9.1.    Dentro de 30 (trinta) dias da implementação integral do Plano de Negócios (ou do Novo Plano ou do Plano de Negócios Ajustado, conforme o caso) ou do dia seguinte ao Prazo Estimado Final da Readequação, o que ocorrer primeiro, a TS deverá, mediante notificação por escrito, informar à ANEAS o montante total de Investimentos no Reposicionamento Comercial efetivamente realizados, disponibilizando, também os documentos comprobatórios da realização de tais investimentos (respectivamente a "Notificação dos Investimentos" e os "Documentos de Comprovação dos Investimentos").

8.9.2.    Caso a ANEAS discorde da qualificação de determinadas despesas como Investimentos no Reposicionamento Comercial ou identifique que foram declarados como realizados Investimentos no Reposicionamento Comercial que, efetivamente, não foram realizados, a ANEAS deverá, em um prazo de até 30 (trinta) dias contados do recebimento da



Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

Notificação dos Investimentos, notificar a TS ("Notificação de Discordância") para que esta retifique os Documentos de Comprovação dos Investimentos ou esclareça, por escrito, os pontos de discordância delineados pela TS.

8.9.3.  Caso as Partes não cheguem a um consenso sobre a versão final dos Documentos de Comprovação dos Investimentos dentro de 60 (sessenta) dias contados do recebimento, pela TS, da Notificação de Discordância, as Partes deverão contratar uma empresa de auditoria independente, de primeira linha, para que esta arbitre a solução para as discordâncias entre as Partes a respeito dos Documentos de Comprovação dos Investimentos, sendo a solução arbitrada pela empresa de auditoria final e definitiva na resolução da discordância entre as Partes, vinculando as Partes ao seu cumprimento ("Decisão da Arbitragem dos Investimentos").

8.9.3.1  Para fins da escolha da empresa de auditoria independente supra referida, a TS deverá, em um prazo de até 5 (cinco) dias úteis contados da expiração do prazo de 60 (sessenta) dias supra previsto, apresentar à ANEAS uma lista tríplice de empresas de auditoria independente para solução das discordâncias, devendo a ANEAS escolher 1 (uma) das empresas indicadas na lista tríplice em até 10 (dez) dias contados do recebimento da lista da TS; caso a ANEAS não opte por uma das empresas no prazo supra, a TS poderá escolher qualquer das empresas indicadas.

8.9.3.2.  Os custos da empresa de auditoria serão suportados pelas Partes proporcionalmente ao valor das discordâncias não reconhecidas pela empresa de auditoria; exemplificativamente, na hipótese de a empresa de auditoria reconhecer como não constituindo Investimentos no Reposicionamento Comercial 80% (oitenta por cento) dos valores contestados pela ANEAS, a TS suportará 80% (oitenta por cento) do custo da empresa de auditoria e a ANEAS 20% (vinte por cento) do custos da empresa de auditoria, e vice-versa.

8.9.4.  Estando de acordo com os Documentos de Comprovação dos Investimentos, a ANEAS deverá enviar à TS, em um prazo de até 30 (trinta) dias contados do recebimento da Notificação dos Investimentos, um termo de aceitação declarando sua concordância ("Termo de Aceitação dos Documentos de Comprovação dos Investimentos"). Na hipótese de a ANEAS não encaminhar até a expiração do prazo de 30 (trinta) dias supra o Termo de Aceitação dos Documentos de Comprovação dos Investimentos, ou ainda, a Notificação de Discordância, considerar-se-á que a ANEAS concordou com os Documentos de Comprovação dos Investimentos.

## CLÁUSULA IX.        DAS GARANTIAS

9.1.  Em garantia ao cumprimento das obrigações assumidas pela ANEAS neste Contrato, especialmente o pagamento da Remuneração TS e da Indenização ANEAS-TS, conforme definida abaixo, neste último caso, especificamente conforme prevista na Cláusula 10.4 abaixo, a ANEAS outorgará, em até 10 (dez) dias úteis contados da implementação das Condições Suspensivas, hipoteca sobre o Conjunto São Luís ("Hipoteca CSL"), a ser formalizada nos termos e condições da minuta de hipoteca integrante deste Contrato como seu Anexo 9.1.

9.1.1.  A Hipoteca CSL deverá ser registrada, pela ANEAS, no Cartório de Registro de Imóveis competente, no prazo de até 30 (trinta) dias contados da data de sua lavratura,

prorrogável automaticamente uma única vez por 30 (trinta) dias adicionais desde que a ANEAS comprove estar tomando de forma diligente e em tempo razoável todas as medidas necessárias para a conclusão do registro da Hipoteca CSL.

9.1.2.     Caso a ANEAS não conclua o registro da Hipoteca CSL no prazo ajustado na Cláusula 9.1.1 acima, a TS terá a faculdade de conduzir as providências para a realização do referido registro.

9.1.3.     Os custos referentes à lavratura e registro da Hipoteca CSL serão suportados em partes iguais por ANEAS e TS. Com relação à parte dos custos de lavratura e registro da Hipoteca CSL de responsabilidade da ANEAS, estes serão antecipados pela TS e pagos pela ANEAS à TS, devidamente corrigidos pelo Índice Eleito desde a data do efetivo desembolso pela TS até a data de seu pagamento pela ANEAS, em 6 (seis) parcelas mensais, iguais e consecutivas, com os recursos decorrentes do Fluxo Financeiro de titularidade da ANEAS a partir do início do Período Remuneratório 2, ficando a Gerenciadora desde já autorizada a efetivar o referido reembolso. .

9.1.4.     As Partes comprometem-se, ainda, a promover a prorrogação ou a reconstituição da Hipoteca CSL, quando e se necessário, para preservar a validade e a eficácia da referida garantia por todo o Prazo do Contrato.

**9.2.**     Adicionalmente à Hipoteca CSL, em garantia ao cumprimento das obrigações assumidas pela ANEAS neste Contrato, a ANEAS cederá fiduciariamente à TS, com eficácia a partir de 01 de setembro de 2020, recebíveis imobiliários decorrentes do Fluxo Financeiro, nos termos da Lei Federal nº 4.728/65 ("Cessão Fiduciária dos Recebíveis"), consoante os termos e as condições do instrumento particular de Cessão Fiduciária dos Recebíveis a ser celebrado entre a ANEAS e a TS, em até 10 (dez) dias úteis contados da data de implementação das Condições Suspensivas, nos termos e condições constantes da minuta integrante deste Contrato como seu Anexo 9.2.

9.2.1.     A Cessão Fiduciária dos Recebíveis deverá ser apresentada para registro pela TS junto ao Cartório de Títulos e Documentos da Comarca de São Paulo, Estado de São Paulo, em até 10 (dez) dias úteis contados da respectiva assinatura, devendo a TS encaminhar à ANEAS 1 (uma) via original no prazo de até 5 (cinco) dias úteis contados da data do efetivo registro, sendo os custos de registro suportados em partes iguais por ANEAS e TS, observando-se o mesmo tratamento objetivado na Cláusula 9.1.3 acima para os custos de registro e lavratura da Hipoteca CSL.

**9.3.**     Contra a celebração da escritura de Hipoteca CSL, celebração do contrato da Cessão Fiduciária de Recebíveis e outorga dos Mandatos, a TS apresentará à "Carta de Fiança Corporativa" emitida pelas suas controladoras imediatas, a TS-26 I, LLC e a TS-26 II, LLC, sendo ambas sociedades constituídas e existentes sob as leis do estado de Delaware, Estados Unidos da América, com sede na Rockfeller Plaza 45, cidade de Nova Iorque, Estado de Nova Iorque, CEP 10111, consistente em fiança corporativa plenamente excutível perante os órgãos jurisdicionais brasileiros competentes, confirmando o compromisso da TS e suas controladoras de cumprir integralmente todas as obrigações assumidas pela TS neste Contrato e, em especial, assumindo responsabilidade solidária pelo pagamento da eventual Indenização TS-ANEAS, nos termos e condições da minuta integrante deste Contrato como seu Anexo 9.3.

9.3.1.     Caso a TS-26 I, LLC e a TS-26 II, LLC, ao tempo da celebração da escritura de Hipoteca CSL e do contrato de Cessão Fiduciária de Recebíveis, não tenham, em conjunto,





recebido aporte de capital de seu(s) sócio(s) em valor no mínimo igual ou superior a R$ 29.000.000,00 (vinte e nove milhões de reais), convencionam as Partes que a Tishman Speyer Brazil Club, LP, sociedade controladora da TS-26 I, LLC e da TS-26 II, LLC, deverá prestar a Carta de Fiança Corporativa em favor da ANEAS na posição de garantidora.

9.3.2.   Na hipótese prevista na Cláusula 9.3.1 acima, as Partes convencionam ainda que, após a capitalização da TS-26 I, LLC e da TS-26 II, LLC em montante no mínimo igual ou superior a R$ 29.000.000,00 (vinte e nove milhões de reais), a Tishman Speyer Brazil Club, LP poderá ser liberada da posição de garantidora da Carta de Fiança Corporativa se a TS (i) enviar à ANEAS os documentos que comprovam a capitalização retro mencionada; e (ii) providenciar a substituição da Carta de Fiança Corporativa prestada pela Tishman Speyer Brazil Club, LP por uma nova Carta de Fiança Corporativa, nos mesmos termos da minuta integrante do Anexo 9.3, subscrita pela TS-26 I, LLC e pela TS-26 II, LLC.

9.4.   As Partes convencionam que as despesas consistentes nas taxas e emolumentos devidos em razão da lavratura da Hipoteca CSL e do registro da Hipoteca CSL e da Cessão Fiduciária dos Recebíveis nos competentes ofícios de cartórios deverão ser suportados e pagos na forma da Cláusula 9.1.3 e 9.2.1. acima, sendo a fração de responsabilidade da TS contabilizados como Investimentos no Reposicionamento Comercial. Caso a ANEAS pague tais taxas e emolumentos, a TS deverá reembolsá-la por tais despesas dentro do prazo de 5 (cinco) dias úteis contados da data de apresentação, pela ANEAS à TS, dos respectivos comprovantes de pagamento.

## CLÁUSULA X.   DA RESOLUÇÃO

10.1.   O presente Contrato deverá permanecer vigente pelo prazo estipulado na CLÁUSULA VI, não podendo ser resilido pela ANEAS ou pela TS antes do transcurso completo do referido prazo, em observância ao disposto no parágrafo único do artigo 473 do Código Civil Brasileiro, ressalvado o disposto nas Cláusulas 7.3, 10.4, 16.8.(ii) e 17.9.

10.1.1.   A ANEAS reconhece expressamente que o cumprimento do presente Contrato implica a realização, pela TS, de investimentos vultosos para a consecução do seu objeto, de tal sorte que não poderá resilir este Contrato antes de expirado o prazo contratual, o qual foi estabelecido pelas Partes como compatível ao vulto dos investimentos que serão realizados pela TS e, por conseguinte, constitui condição essencial do negócio objetivado neste Contrato, observado o disposto na Cláusula 10.4 abaixo.

10.1.2.   A ANEAS reconhece expressamente, ainda, que também constitui condição do negócio objetivado neste Contrato a manutenção da propriedade da totalidade do Conjunto São Luís pela ANEAS durante todo o prazo de vigência deste Contrato, assim como a não oneração do Conjunto São Luís, total ou parcial, durante a vigência deste Contrato, ressalvadas as exceções aqui expressamente previstas.

10.2.   Não obstante o disposto na Cláusula 10.1 acima, a TS poderá resilir o presente Contrato, mediante notificação por escrito à ANEAS, hipótese na qual a ANEAS deverá pagar à TS a Indenização ANEAS-TS, conforme definida na Cláusula 10.5 abaixo, caso, durante a vigência deste Contrato, verifique-se qualquer dos seguintes eventos:

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

(i)      alienação, direta ou indireta, parcial ou total do Conjunto São Luís pela ANEAS em desrespeito ao disposto na Cláusula 16.1;

(ii)     observado o disposto na Cláusula 16.1, alienação, direta ou indireta, parcial ou total do Conjunto São Luís pela ANEAS para terceiros comprovadamente inidôneos ou sem condições financeiras de arcar com as obrigações objeto deste Contrato;

(iii)    observado o disposto na Cláusula 16.1, alienação, direta ou indireta, parcial ou total do Conjunto São Luís pela ANEAS para terceiros (sem que haja a celebração do Aditamento de Admissão do Terceiro Adquirente, nos termos da Cláusula 16.8.(i) ou sem que seja respeitado o Direito de Preferência da TS); ou

(iv)    oneração, parcial ou total do Conjunto São Luís por ato voluntário da ANEAS ou imposição de ônus sobre parte ou totalidade do Conjunto São Luís (salvo aqueles já existentes na data de assinatura deste Contrato e devidamente registrados na Matrícula do Imóvel ("Ônus Existentes"), desde que a ANEAS não demonstre estar tomando todas as medidas necessárias para cancelamento do referido ônus, inclusive no sentido de evitar que referido ônus possa apresentar qualquer risco à transação aqui objetivada e os ocupantes do Conjunto São Luís, ou ainda que, no entendimento fundamentado da TS, haja risco efetivo financeiro de a ANEAS não conseguir honrar com a dívida que resultou na imposição de tal ônus.

10.2.1.    A TS declara e reconhece que possui conhecimento dos Ônus Existentes e que tais ônus não constituem qualquer óbice ao cumprimento pleno e tempestivo das obrigações previstas neste Contrato.

**10.3.**       A ANEAS terá o direito de resilir o presente Contrato caso a TS descumpra obrigação contratual, inclusive na hipótese de eventual atraso na conclusão das Obras de Melhoria e Readequação além do Prazo Estimado Final da Readequação, que tenha causado ou possa comprovadamente causar prejuízos à ANEAS superiores a R$ 10.000.000,00 (dez milhões de reais), valor este corrigido desde a data de celebração deste Contrato até a data do evento pela variação acumulada do Índice Eleito.

**10.4.**       Na hipótese de ocorrência das hipóteses previstas nas Cláusulas 10.2 ou 10.3 acima, a Parte inocente deverá notificar a Parte infratora por escrito. Se a Parte infratora não sanar sua inadimplência em até 45 (quarenta e cinco) dias após a referida notificação, ou, caso a inadimplência seja de tal natureza que não possa ser sanada dentro desse período de 45 (quarenta e cinco) dias, e a Parte infratora, dentro desse prazo, não inicie as medidas necessárias para sanar tal inadimplemento, a Parte inocente poderá resolver o presente Contrato mediante o envio de simples comunicação à Parte infratora com 60 (sessenta) dias de antecedência.

**10.5.**       Caso o Contrato seja rescindido na forma supra, (i) a ANEAS deverá pagar à TS a parcela ou saldo da parcela de responsabilidade da ANEAS, conforme o caso, referente aos custos de lavratura e registro da Hipoteca CSL e registro da Cessão Fiduciária de Recebíveis caso a rescisão ocorra antes do reembolso total de tais custos pela ANEAS à TS e (ii) as Partes deverão pagar exclusivamente os valores descritos na tabela abaixo, tendo em vista o momento e a Parte que der causa à rescisão, conforme adiante detalhado:

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

| Momento | Rescisão por culpa da ANEAS | Rescisão por culpa da TS |
|---|---|---|
| Entre a celebração deste Contrato e a obtenção do Habite-se de todo o Conjunto São Luís. | A Indenização devida pela ANEAS à TS ("Indenização ANEAS-TS") será equivalente à soma de Investimento Realizado e Multa Compensatória, onde:<br><br>"Multa Compensatória" significa 10% (dez por cento) do Valor Mínimo 1.<br><br>"Investimento Realizado" significa o montante de Investimentos na Reposição Comercial efetivamente realizados pela TS.<br><br>Para fins de cálculo da Indenização ANEAS-TS nas hipóteses em que haja culpa da ANEAS, os Investimentos para Reposicionamento Comercial serão acrescidos de taxa de 25% (vinte e cinco por cento) ao ano, *pro rata die*, desde a data de seu pagamento até a data de pagamento da indenização em questão, sem acréscimo de qualquer outra taxa de correção ou atualização. | A Indenização devida pela TS à ANEAS ("Indenização TS-ANEAS") será equivalente à Multa Compensatória.<br><br>A ANEAS deverá reembolsar à TS o Investimento Realizado.<br><br>"Multa Compensatória" significa 10% (dez por cento) do Valor Mínimo 1.<br><br>"Investimento Realizado" significa o montante de Investimentos na Reposição Comercial efetivamente realizados pela TS. |
| Após a obtenção do Habite-se de todo o Conjunto São Luís. | A Indenização ANEAS-TS será equivalente a 120% (cento e vinte por cento) da Remuneração TS Estimada Mensal, a ser paga pela ANEAS à TS mensalmente, na mesma data de pagamento da Remuneração TS, até o final do prazo estabelecido na Cláusula 6.1. | A Indenização ANEAS-TS será equivalente a 80% (oitenta por cento) da Remuneração TS Estimada Mensal, a ser paga pela ANEAS à TS mensalmente, na mesma data de pagamento da Remuneração TS, até o final do prazo estabelecido na Cláusula 6.1. |

**10.6.** A "Remuneração TS Estimada Mensal" corresponde à estimativa de remuneração mensal à qual a TS faria jus no curso normal do Contrato, durante o tempo restante do Prazo do Contrato, contado da data de rescisão em questão, com base em uma avaliação a ser realizada consoante as regras enunciadas abaixo.

**10.7.** Para fins da determinação da Remuneração TS Estimada Mensal, as Partes deverão, cada uma, contratar, às suas próprias expensas, em até 30 (trinta) dias da data de rescisão deste Contrato, uma empresa de avaliação imobiliária, com reputação ilibada e reconhecimento internacional, para calcular a Remuneração TS Estimada Mensal, devendo tais empresas deter qualificação técnica e experiência para a execução da avaliação em questão (cada uma dessas empresas, "Empresa de Avaliação"). Caso qualquer das Partes deixe de indicar uma empresa de avaliação no prazo supra previsto, será considerado que renunciou ao seu direito de indicar uma Empresa de Avaliação, de tal sorte que o laudo da Empresa de Avaliação indicado por uma das Partes será considerado como final e definitivo para fins de determinação da Remuneração TS Estimada Mensal.

10.7.1. As Empresas de Avaliação deverão considerar, no cálculo da Remuneração TS Estimada Mensal, os contratos de locação vigentes à data da rescisão, além de outros fatores que julgarem pertinentes.

10.7.2. Cada Empresa de Avaliação deverá entregar à respectiva Parte contratante, em até 60 (sessenta) dias contados da respectiva contratação, um laudo de avaliação que indique o

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

valor mensal fixo que, na respectiva melhor opinião, deveria ser pago a título de Remuneração TS Estimada Mensal pela ANEAS à TS.

10.7.3.   Caso o quociente da divisão do maior valor das avaliações pelo menor valor seja igual ou inferior a 1,1 (um inteiro e um décimo), a Remuneração TS Estimada Mensal a ser considerada para fins deste Contrato será igual à média aritmética dos valores das avaliações realizadas pelas citadas Empresas de Avaliação.

10.7.4.   Caso o quociente da divisão do maior valor das avaliações pelo menor valor seja superior a 1,1 (um inteiro e um décimo), as Empresas de Avaliação originalmente indicadas pelas Partes deverão indicar uma terceira Empresa de Avaliação, em até 10 (dez) dias contados da apresentação do último laudo de avaliação das Empresas de Avaliação originais, para proceder uma nova avaliação ("Terceira Empresa de Avaliação"), sendo os custos desta Terceira Empresa de Avaliação divididos entre TS e ANEAS.

10.7.5.   A Terceira Empresa de Avaliação deverá entregar às Partes, em até 30 (trinta) dias contados da respectiva contratação, um laudo de avaliação que indique o valor mensal fixo que, na respectiva melhor opinião, deveria ser pago a título de Remuneração TS Estimada Mensal pela ANEAS à TS; sendo certo que o valor definitivo e final da Remuneração Estimada Mensal para fins deste Contrato corresponderá:

(i) ao maior valor indicado pelas Empresas de Avaliação originais, caso o resultado da avaliação da Terceira Empresa de Avaliação seja superior ao maior valor dos laudos das Empresas de Avaliação originais;

(ii) ao menor valor indicado pelas Empresas de Avaliação originais, caso o resultado da avaliação da Terceira Empresa de Avaliação seja inferior ao menor valor dos laudos das Empresas de Avaliação originais; e

(iii) ao valor indicado pela Terceira Empresa de Avaliação caso o resultado da avaliação da Terceira Empresa de Avaliação seja inferior ao maior valor dos laudos das Empresas de Avaliação originais e superior ao menor valor dos laudos das Empresas de Avaliação originais.

10.7.6.   As Empresas de Avaliação e a Terceira Empresa de Avaliação deverão ser completamente independentes em relação às Partes e não poderão ter sido contratadas por qualquer uma das Partes ou sociedades pertencentes a seu respectivo grupo econômico para prestar serviços de avaliação de imóveis no ano que anteceder a contratação supra referida.

10.7.7.   A partir da rescisão do Contrato e até a decisão final quanto à Remuneração TS Estimada Mensal, a TS continuará recebendo, mensalmente, o valor da Remuneração TS média dos últimos 12 (doze) meses anteriores à rescisão do Contrato; sendo que uma vez definida a Remuneração TS Estimada Mensal, o eventual valor a maior ou a menor recebido pela TS será compensado ou acrescido nos meses subsequentes à decisão final da Remuneração TS Estimada mensal, à base de 20% (vinte por cento) ao mês.

**10.8.**   A Remuneração TS Estimada Mensal deverá ser corrigida pelo Índice Eleito, na menor periodicidade permitida em lei para correção do aluguel mensal em contratos de locação não residencial.

**10.9.** Na hipótese de a ANEAS não efetuar tempestivamente o pagamento da Remuneração TS Estimada Mensal, incidirão sobre os valores em atraso as penalidades e cominações previstas na Cláusula 8.3.1 acima. Na hipótese de atraso superior a 60 (sessenta) dias, observada notificação prévia da TS para ANEAS para purgar a mora em até 30 (trinta) dias, a TS poderá decretar o vencimento antecipado das parcelas remanescentes da Remuneração TS Estimada Mensal, mediante notificação por escrito à ANEAS, hipótese na qual a ANEAS deverá pagar à TS o valor total devido em até 5 (cinco) dias úteis da notificação da TS decretando o vencimento antecipado das parcelas remanescentes da Remuneração TS Estimada Mensal.

**10.10.** Os prazos supra referidos de 60 (sessenta) e 30 (trinta) dias serão reduzidos para respectivamente, 30 (trinta) e 15 (quinze) dias, inclusive para fins do segundo evento de inadimplência em questão, caso a ANEAS atrase o pagamento da Remuneração TS Estimada Mensal em um prazo de até 5 (cinco) anos contados de um primeiro atraso no pagamento da Remuneração TS Estimada Mensal.

**10.11.** A ANEAS reconhece que a Indenização ANEAS-TS visa a, em consonância com o parágrafo único do artigo 473 do Código Civil Brasileiro, ressarcir todos os investimentos a serem feitos e feitos pela TS na consecução do objeto do presente Contrato, assim como na viabilização do objeto deste Contrato em si, reconhecendo como legítimo o direito da TS de receber a referida indenização na sua íntegra na forma prevista na tabela constante da Cláusula 10.4 acima.

**10.12.** Sem prejuízo do disposto na Cláusula 10.5, a TS reconhece que a Indenização TS-ANEAS visa a ressarcir: (i) todos os danos, despesas e custos que a ANEAS venha a sofrer em decorrência da necessidade de substituição da TS em todas as funções que a TS desempenhar em consonância com este Contrato; (ii) lucros cessantes decorrentes diretamente do inadimplemento contratual da TS sob este Contrato; e (iii) sem prejuízo ou limitação ao disposto retro, o aumento do custo do capital dos investimentos que a TS deixar de realizar para a consecução das Obras de Melhoria e Readequação e que deverão ser feitos por terceiros.

## CLÁUSULA XI.        DA ENTREGA DO CONJUNTO SÃO LUÍS

**11.1.** As Partes convencionam que, após o transcurso total do prazo deste Contrato ou após a rescisão ou extinção, por qualquer razão ou causa, deste Contrato, ressalvado o disposto na Cláusula 11.2 abaixo, a TS deverá restituir o Conjunto São Luís à ANEAS em boas condições de conservação e com as reformas acordadas no laudo previsto na Cláusula 5.4.2 acima, substancialmente em conformidade com o teor dos projetos *as built* a serem entregues pela Construtora, ressalvado o desgaste natural decorrente do uso ordinário do Imóvel, e desde que: (i) a TS Administradora tenha sido mantida como administradora predial do Conjunto São Luís, e tenha sido permitido à TS Administradora a provisão da manutenção periódica, preventiva e corretiva do Conjunto São Luís, e (ii) as propostas de orçamento anual tenham sido devidamente aprovadas considerando as recomendações da TS Administradora no que tange ao recursos necessários a fazer face às despesas necessárias para que as manutenções periódicas, preventivas e corretivas sejam devidamente e tempestivamente realizadas, sendo ainda as referidas despesas condominiais integralmente e tempestivamente satisfeitas.

**11.2.** Caso a rescisão ocorra antes da entrega da obra, a TS deverá restituir o Conjunto São Luís no estado em que se encontrar à época da rescisão.

**CLÁUSULA XII.     DA CESSÃO DE CRÉDITOS E CONSTITUIÇÃO DE FUNDOS DE INVESTIMENTO**

**12.1.**     Fica desde já acordado que, a exclusivo critério da TS, e à medida que a TS realizar as Obras de Melhoria e Readequação e na proporção de referida realização, a Remuneração TS poderá ser cedida a terceiros, podendo, inclusive, ser utilizada como lastro para fins de securitização, ou ainda poderá ser cedida fiduciariamente em garantia de operação financeira, ficando desde já autorizada a divulgação deste Contrato às instituições financeiras para os fins ora previstos.

**12.2.**     A TS compromete-se a apresentar à ANEAS a operação financeira a ser realizada visando a antecipação de recebíveis, de forma que, caso a ANEAS queira também participar de referida operação financeira com seus próprios recebíveis, a ANEAS terá essa opção, caso aplicável e possível.

**12.3.**     Outrossim, e observados os limites previstos neste Contrato, a TS poderá também constituir um fundo de investimento imobiliário ou fundo de investimento em direitos creditórios ("Fundo") e aportar os seus recebíveis oriundos deste Contrato ou os recebíveis decorrentes de operação de securitização de que trata a Cláusula 12.1 no Fundo, ficando certo e ajustado que o Fundo será gerido pela ou terá como consultor a TS ou suas Afiliadas.

12.3.1.     Para fins do disposto na Cláusula 12.3 acima, entende-se por "Afiliadas" da TS (i) as sociedades que a Controlem, direta ou indiretamente, (ii) as sociedades Controladas, direta ou indiretamente, pela TS, (iii) as sociedades que são Controladas, direta ou indiretamente, por uma sociedade que Controla a TS, ou (iv) qualquer outra sociedade sob Controle comum ou compartilhado, direta ou indiretamente, pela TS ou por seu Controlador.

**12.4.**     Sem prejuízo do disposto retro, a ANEAS não terá a obrigação, em qualquer hipótese, de ceder seus direitos creditórios decorrentes deste Contrato a qualquer pessoa.

**CLÁUSULA XIII.     DA CONFIDENCIALIDADE**

**13.1.**     Para os fins deste Contrato, a expressão "Informações Confidenciais" significa quaisquer informações, anotações, análises, estudos relatórios e dados divulgados por uma das Partes ("Parte Divulgadora") à outra Parte ("Parte Receptora") relacionados, direta ou indiretamente, (i) à Parte Divulgadora, seus negócios, tecnologias, *know-how*, segredo de negócios, informações técnicas, administrativas ou comerciais que ela possua ou utilize, bem como (ii) ao Contrato, a execução deste e o desenvolvimento das Obras de Melhoria e Readequação do Conjunto São Luís, sejam tais informações, anotações, análises, estudos relatórios e dados divulgados por escrito, verbalmente, graficamente, eletronicamente ou por qualquer outro meio ou forma, independentemente de o proprietário dessas informações, anotações, análises, estudos relatórios e dados ser a Parte Divulgadora ou quaisquer pessoas físicas e/ou jurídicas com as quais a Parte Divulgadora se relacione no curso de seu negócio.

**13.2.**     As Informações Confidenciais não incluem informações que: (i) sejam conhecidas pelo público em geral ou estejam disponíveis de modo geral mediante publicação, uso comercial ou de outro modo sem que haja descumprimento neste sentido por parte da Parte Receptora; ou (ii) sejam divulgadas por escrito pela Parte Divulgadora para publicação.





**13.3.** As Partes compreendem, aceitam e reconhecem que a Parte Divulgadora somente divulgará as Informações Confidenciais à Parte Receptora em razão dos compromissos de sigilo, confidencialidade e não-divulgação assumidos pela Parte Receptora por meio deste Contrato.

**13.4.** Caso a Parte Receptora não esteja certa quanto à natureza confidencial ou sigilosa de determinada informação, tendo dúvidas se tal informação se encontra abrangida pelo conceito de Informação Confidencial previsto neste Contrato, a Parte Receptora deverá procurar orientação por escrito da Parte Divulgadora antes de divulgar ou transmitir tal informação a qualquer outra pessoa física ou jurídica.

**13.5.** A Parte Receptora compromete-se a: (i) manter sob sigilo todas as Informações Confidenciais, não as divulgando a qualquer terceiro, quer seja pessoa física ou jurídica, sem o consentimento prévio por escrito da Parte Divulgadora; (ii) não fazer cópias das Informações Confidenciais sem o consentimento prévio por escrito da Parte Divulgadora; e (iii) guardar e manter todas as Informações Confidenciais em local seguro e adequadamente protegidas de forma a assegurar que nenhuma pessoa não-autorizada tenha acesso a tais Informações Confidenciais.

**13.6.** A Parte Receptora apenas poderá transmitir a terceiros qualquer Informação Confidencial pertinente à Parte Divulgadora caso (i) seja imprescindível que o terceiro receptor pertinente receba tal Informação Confidencial para que a Parte Receptora cumpra suas obrigações decorrentes deste Contrato; e (ii) a Parte Receptora celebre, com o terceiro receptor, acordo de confidencialidade que reflita, no mínimo, os mesmos padrões de sigilo previstos nesta CLÁUSULA XIII.

**13.7.** A Parte Receptora não será responsável pela divulgação das Informações Confidenciais se tal divulgação se der em virtude de ordem judicial ou emanada por qualquer órgão governamental competente ou por qualquer outra entidade da administração pública, desde que a Parte Receptora comunique à Parte Divulgadora por escrito imediatamente após o recebimento pela Parte Receptora da referida ordem, de maneira a permitir que a Parte Divulgadora adote as medidas legais que considerar apropriadas. A Parte Receptora compromete-se a divulgar somente a exata fração das Informações Confidenciais necessária para o cumprimento de tal ordem judicial ou administrativa.

**13.8.** A Parte Receptora deverá imediatamente avisar a Parte Divulgadora, por escrito, acerca de qualquer uso inadequado, divulgação não-autorizada ou apropriação ilegal das Informações Confidenciais que tenha chegado ao seu conhecimento.

13.8.1. A Parte Receptora, observado o disposto na Cláusula 13.8, deverá envidar seus melhores esforços para tomar todas as medidas necessárias e adequadas para mitigar os efeitos do eventual uso inadequado, divulgação não-autorizada ou apropriação ilegal das Informações Confidenciais.

**13.9.** Todas as Informações Confidenciais fornecidas pela Parte Divulgadora à Parte Receptora, bem como todas e quaisquer informações, produtos, estudos, documentos ou materiais preparados pela Parte Divulgadora usando, compreendendo ou refletindo de qualquer maneira as Informações Confidenciais, constituem e deverão permanecer propriedade da Parte Divulgadora ou das pessoas físicas e/ou jurídicas que tenham divulgado tais Informações Confidenciais à Parte Divulgadora.

**13.10.** As obrigações de confidencialidade previstas nesta CLÁUSULA XIII permanecerão válidas e eficazes durante todo o período de vigência deste Contrato e após o seu término, por qualquer razão ou causa, pelo prazo de 5 (cinco) anos.

## CLÁUSULA XIV.   DAS DECLARAÇÕES E GARANTIAS DAS PARTES

**14.1.** Sem prejuízo de outras declarações e garantias prestadas pelas Partes no presente Contrato, as Partes prestam uma à outra as seguintes declarações e garantias:

(i)   Liberdade de Contratação. As Partes celebram o presente Contrato após terem tido ampla oportunidade de rever os seus termos e condições, possuem total entendimento destes e de suas obrigações e são capazes de assumi-las;

(ii)   Inexistência de Violação, Consentimentos. A assinatura e formalização deste Contrato pelas Partes, o cumprimento pelas Partes de todas e quaisquer das suas obrigações nos termos deste Contrato não: (a) violam ou conflitam com qualquer lei em vigor aplicável às Partes; e (b) dependem do consentimento de qualquer pessoa física ou jurídica que seja terceiro a este Contrato;

(iii)   Restrições. Não há qualquer procedimento judicial ou extrajudicial perante qualquer autoridade governamental contra as Partes que possa gerar qualquer espécie de restrição ao cumprimento das obrigações objeto do presente Contrato. As Partes desconhecem qualquer fato ou situação que possa gerar um procedimento judicial ou extrajudicial perante qualquer autoridade estatal contra as Partes que as impeça de cumprir perfeitamente este Contrato, ressalvado o disposto na Matrícula do Imóvel;

(iv)   *Compliance*. Não há em curso e não houve no passado qualquer procedimento judicial ou extrajudicial acusando as Partes da prática de qualquer ato lesivo à administração pública brasileira ou estrangeira ou ato de corrupção. As Partes declaram e garantem, também, que não conhecem qualquer fato que possa engendrar a instauração de processo ou procedimento – judicial ou extrajudicial – em que se alegue a prática, por elas, de qualquer ato lesivo à administração pública ou ato de corrupção. As Partes declaram e garantem, ainda, que, durante a execução das prestações que constituem objeto deste Contrato, não praticarão qualquer ato lesivo à administração pública ou ato de corrupção.

**14.2.** TS adicionalmente declara e garante à ANEAS que:

(i)   já realizou de modo exitoso diversos empreendimentos complexos como o objeto deste Contrato;

(ii)   possui todos os recursos técnicos, humanos e econômico-financeiros para iniciar, realizar e concluir com êxito e pontualmente todas as prestações que constituem o objeto deste Contrato; e

(iii)   sem prejuízo da questão da eventual necessidade de outorga endereçada na Cláusula 3.3 deste Contrato, teve tempo suficiente para adequada e profundamente analisar o Imóvel e elaborar o Plano de Negócios, tendo recebido todas as informações solicitadas à ANEAS e adequadamente vistoriado o Imóvel.

**14.3.** ANEAS adicionalmente declara e garante à TS que: é legítima senhora e possuidora do Conjunto São Luís, que se encontra livre e desembaraçado de quaisquer ônus reais ou pessoais, legais ou convencionais, judiciais ou extrajudiciais, dívidas ou dúvidas de qualquer natureza, exceção feita aos Ônus Existentes, que decorrem de dívidas de IPTU e que a ANEAS expressamente declara não constituírem risco à transação objetivada neste Contrato, comprometendo-se, ainda, a ANEAS, a tomar as medidas necessárias para que os Ônus Existentes não impeçam a consecução da transação aqui objetivada.

**14.4.** Na mais ampla extensão permitida por lei, ANEAS e a TS protegerão, defenderão, indenizarão e manterão a outra Parte e seu(s) representantes isentos, assim como seus respectivos prepostos, sócios, membros, diretores, administradores e empregados por e contra todos as perdas, danos, passivos, reclamações, condenações, sentenças, custos e despesas relacionadas, depósitos e custas judiciais, honorários advocatícios, excluindo, em qualquer hipótese, lucros cessantes, danos indiretos, morais ou extrapatrimoniais, perdas de oportunidade e danos em ricochete ("Perdas"), decorrentes da execução ou omissão na execução do presente Contrato ou ainda relativas à violação ou inadimplemento de qualquer obrigação decorrente deste Contrato ou ainda decorrentes de fatos relativos ao Conjunto São Luís, inclusive pretéritos à celebração deste Contrato, ou ainda decorrentes de qualquer violação, falsidade ou inexatidão de qualquer informação, declaração ou garantia prestada por uma parte à outra neste Contrato ou ainda decorrente da execução deste Contrato.

**CLÁUSULA XV.     LIBERAÇÃO DO CONJUNTO SÃO LUÍS E USOS ESPECIAIS DE DETERMINADAS ÁREAS PELA ANEAS**

**15.1.** Liberação do Conjunto São Luís. Para os fins objetivados neste Contrato, a ANEAS obriga-se a completar o integral deslocamento do Colégio São Luís para outra localidade de seu interesse, às suas expensas e sob sua responsabilidade, entre 30 de abril de 2020 e 30 de dezembro de 2020. Em caso de eventual atraso na integral realocação do Colégio São Luís, todos os demais prazos previstos neste Contrato, em seus Anexos e também no Plano de Negócios serão automaticamente prorrogados na proporção do atraso da ANEAS em concluir o deslocamento do Colégio São Luís para outra localidade, sem a aplicação de quaisquer penalidades, de quaisquer naturezas, à TS.

15.1.1.   Sem prejuízo do disposto na Cláusula 15.1 acima, a ANEAS compromete-se a franquear à TS acesso ao Conjunto São Luís, desde a presente data, para que a TS viabilize os trabalhos preparatórios e de planejamento e execução das Obras de Melhoria e Readequação no que não interferirem nas atividades do Colégio São Luís.

**15.2.** Uso dos conjuntos 172 e 174 do Edifício São Luís Gonzaga. A ANEAS terá o direito de continuar usando, por todo o prazo de vigência do Contrato, 2 (dois) conjuntos de salas do Edifício São Luís Gonzaga, identificadas pelos números 172 e 174 que totalizam 910,06 m² metros quadrados, sem qualquer ajuste à Remuneração TS, sendo certo que, enquanto a ANEAS mantiver o direito de uso de tais unidades:

(i)     a ANEAS deverá sempre pagar os encargos condominiais e eventuais tributos que venham a incidir sobre os referidos conjuntos; e

(ii)    após 5 (cinco) anos contados da presente data, deverá ser adicionado ao Fluxo Financeiro um crédito equivalente ao Aluguel Uso Próprio, o qual deverá ser compensado, mensalmente, e de forma meramente escritural, com igual valor da Remuneração ANEAS;

15.2.1.　　Para fins deste Contrato, "Aluguel Uso Próprio" significa 70% (setenta por cento) da média aritmética dos aluguéis por metro quadrado praticados na Torre A do Conjunto São Luís no mês imediatamente anterior ao da apuração em questão multiplicado pela metragem dos conjuntos citados na Cláusula 15.2.

**15.3.**　　Uso de 3 (três) salões do Conjunto São Luís. Adicionalmente ao disposto acima, a ANEAS terá o direito de manter o uso de 3 (três) salões do Conjunto São Luís, denominados Salão São Luís, Salão Anchieta e Salão Santo Inácio, devidamente identificados no Anexo 15.3, até 31 de dezembro de 2020, sem qualquer custo, exceção feita a encargos condominiais e eventuais tributos que venham a incidir sobre os referidos salões.

## CLÁUSULA XVI.　　ALIENAÇÃO DO IMÓVEL E DIREITO DE PREFERÊNCIA

**16.1.**　　A ANEAS compromete-se, neste ato, perante a TS, a não alienar o Imóvel a terceiros até a implementação integral do Plano de Negócios (ou do Novo Plano ou do Plano de Negócios Ajustado, conforme o caso) ou até o Prazo Estimado Final da Readequação, o que ocorrer primeiro.

**16.2.**　　Após o transcurso do período referido na Cláusula 16.1 acima, a ANEAS somente poderá alienar o Imóvel a terceiros observando o Direito de Preferência que a TS possui nos termos deste Contrato, e desde que (i) o terceiro adquirente se comprometa, por meio de instrumento vinculante, a cumprir plenamente este Contrato nos termos da Cláusula 16.8.1; e (ii) a venda não seja feita a terceiro comprovadamente inidôneo ou sem condições financeiras de arcar com as obrigações objeto deste Contrato.

**16.3.**　　Direito de Preferência. As Partes convencionam que a TS, durante a vigência do Contrato, terá o direito de preferência na aquisição do Imóvel, o qual poderá ser exercitado pela TS nos termos desta CLÁUSULA XVI ("Direito de Preferência").

**16.4.**　　Exercício do Direito de Preferência. Caso a ANEAS receba uma oferta vinculante de terceiro para a alienação do Imóvel e deseje aceitar tal oferta ("Oferta de Aquisição"), o que somente poderá ocorrer após o decurso do prazo referido na Cláusula 16.1 acima, a ANEAS deverá (i) comunicar a TS sobre a Oferta de Aquisição recebida e sua intenção de aceitar tal oferta ("Notificação de Direito de Preferência"); (ii) informar à TS, na própria Notificação de Direito Preferência, as condições da alienação propostas na Oferta de Aquisição; e (iii) conceder à TS prazo de 90 (noventa) dias, contados do recebimento, pela TS, da Notificação de Direito de Preferência, para que a TS declare se deseja adquirir o Imóvel nas mesmas condições formuladas na Oferta de Aquisição.

**16.5.**　　Caso a TS, em resposta à Notificação de Preferência (tal resposta denominada "Resposta à Notificação de Preferência"), manifeste, por meio de oferta de aquisição vinculante, que deseja adquirir o Imóvel em condições no mínimo iguais ou mais favoráveis à ANEAS que aquelas formuladas na Oferta de Aquisição ("Oferta Vinculante TS"), a ANEAS ficará obrigada a aceitar a Oferta Vinculante TS e a TS a cumprir todas as obrigações inerentes a tal aceitação, incluindo mas sem se limitar ao pagamento de penalidades pelo eventual descumprimento de obrigações previstas na Oferta de Aquisição.

16.5.1.　　Na hipótese de a Oferta de Aquisição contemplar pagamentos nos primeiros 90 (noventa) dias contados da data de aceite da citada oferta, a TS terá o direito de efetivar todos os pagamentos que seriam devidos pelo terceiro em tal período no 90º (nonagésimo) dia



Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

contado do exercício do Direito de Preferência, devidamente atualizados com base no índice de correção monetária prevista na Oferta de Aquisição ou, na sua ausência, com base no Índice Eleito, sem prejuízo dos demais encargos previstos na Oferta de Aquisição.

**16.6.** Caso a TS, na Resposta à Notificação de Preferência, manifeste que não deseja adquirir o Imóvel ou não oferte condições no mínimo iguais àquelas formuladas na Oferta de Aquisição, a ANEAS deverá revelar à TS a identidade do terceiro interessado e, desde que verificado o atendimento pelo terceiro das condições previstas na Cláusula 16.2 acima, a ANEAS estará livre para aceitar a Oferta de Aquisição do terceiro e consumar o negócio ali contemplado, observado o disposto na Cláusula 16.8 abaixo.

**16.7.** Caso a ANEAS não consume o negócio contemplado na Oferta de Aquisição nos 180 (cento e oitenta) dias seguintes ao recebimento da Resposta à Notificação de Preferência não exercendo o Direito de Preferência, a ANEAS deverá oferecer nova oportunidade para exercício do Direito de Preferência referido na Cláusula 16.3 acima, tanto nas condições objeto da Oferta de Aquisição ou ainda caso a ANEAS receba nova oferta vinculante de terceiros para a alienação do Imóvel e tenha interesse em vender o Imóvel, repetindo-se os procedimentos previstos nas Cláusulas 16.4, 16.5 e 16.6 acima.

**16.8.** Caso a ANEAS, respeitando o Direito de Preferência da TS, aceite uma Oferta de Aquisição e o terceiro emissor da Oferta cumpra com as condições previstas na Cláusula 16.1 acima ("Terceiro Adquirente"), a TS poderá:

(i)     consentir com a cessão da posição da ANEAS neste Contrato para o Terceiro Adquirente, hipótese na qual, como condição de conclusão da transferência para o Terceiro Adquirente, a ANEAS, a TS e o Terceiro Adquirente deverão celebrar um aditamento a este Contrato para que o Terceiro Adquirente assuma integralmente a posição jurídica contratual ocupada pela ANEAS neste Contrato conforme minuta constante do Anexo (i) ("Aditamento de Admissão do Terceiro Adquirente"); ou

(ii)    não consentir com a cessão da posição contratual da ANEAS neste Contrato para o Terceiro Adquirente, hipótese na qual este Contrato será rescindido sem qualquer ônus ou penalidade para as Partes, exceto a obrigação da ANEAS de pagar à TS a Indenização ANEAS-TS que, exclusivamente nesta hipótese, será equivalente a 100% (cem por cento) da Remuneração TS Estimada Mensal, durante o período restante do Contrato, aplicando-se a este pagamento as mesmas regras previstas para o pagamento da Remuneração TS Estimada Mensal, assim como as disposições das Cláusulas 10.8 a 10.10 deste Contrato.

16.8.1.    As Partes declaram e reconhecem que a hipótese de resolução prevista na Cláusula 16.8.(ii) supra não caracteriza culpa de nenhuma das Partes.

## CLÁUSULA XVII.     DAS DISPOSIÇÕES GERAIS

**17.1.** Tolerância. A falha, por qualquer Parte, em agir ou tomar quaisquer medidas contra a inadimplência da outra Parte não deverá ser considerada como renúncia ao direito de tomar as medidas necessárias para sanar ou impedir tal inadimplência, nem como liberação, renúncia ou novação de quaisquer dos termos e condições deste Contrato.

**17.2.**     Aditamentos. Qualquer aditamento ou modificação deste Contrato deverá ser efetuado por escrito, por meio de instrumento elaborado especificamente para essa finalidade, que deverá ser assinado pelos representantes legais das Partes.

**17.3.**     Nenhuma das Partes terá o direito exigir a responsabilidade e obrigação da outra Parte para efetuar pagamentos, praticar os atos aqui descritos ou cumprir as obrigações contidas neste Contrato, através de qualquer medida legal, judicial ou extrajudicial, contra qualquer membro, acionista, quotista, sócio, gerente, diretor, agente, afiliado, beneficiário, procurador, representante ou empregado de tal parte, seja direta ou indiretamente, exceto nas hipóteses expressamente admitidas neste Contrato. Adicionalmente, as Partes concordam que sua responsabilidade seja limitada aos seus ativos, não se estendendo, em hipótese alguma, aos bens dos quotistas, sócios, diretores, representantes ou empregados, exceto nas hipóteses expressamente admitidas neste Contrato.

**17.4.**     Responsabilidade pelo Sucesso Comercial do Empreendimento. A TS não poderá ser responsabilizada pelo sucesso ou insucesso *per se* da exploração empresarial do Conjunto São Luís tal como prevista no Plano de Negócios. A responsabilidade da TS está limitada ao cumprimento dos deveres e obrigações expressamente previstos e assumidos pela TS neste Contrato.

**17.5.**     Vinculação e Sucessão. Este Contrato obriga e vincula as Partes e seus respectivos sucessores e cessionários; ressalvado que nenhuma Parte poderá ceder, delegar ou de outra forma transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato sem o consentimento prévio e por escrito da outra Parte, observado o disposto previsto na CLÁUSULA XII acima.

**17.6.**     Separabilidade das Disposições. Cada cláusula do presente Contrato constitui uma obrigação, avença ou disposição separada e distinta. Na hipótese de qualquer disposição contida neste Contrato vier a ser considerada ilegal ou inexequível, tal disposição será separada deste Contrato, mas todas as demais disposições deste Contrato permanecerão em vigor e produzindo seus efeitos. A disposição ilegal ou inexequível deverá ser substituída por uma disposição, válida e exequível, convencionada de comum acordo entre as Partes, que mais se aproxime dos objetivos pretendidos pelas Partes.

**17.7.**     Execução Específica. As Partes entendem e concordam que todos os termos, condições e obrigações estabelecidos neste Contrato estão sujeitos a execução específica, conforme o disposto no artigo 815 e seguintes do Código de Processo Civil Brasileiro.

**17.8.**     Direitos de Propriedade Intelectual. As Partes concordam que a TS não receberá, nem durante a vigência do Contrato nem após o termo final do Contrato, remuneração adicional à remuneração estipulada neste Contrato pelos direitos de propriedade intelectual sobre os projetos, relatórios, pareceres e estudos desenvolvidos pela TS ou seus consultores e utilizados na execução do objeto do presente Contrato, sendo certo que esses direitos de propriedade intelectual serão de titularidade da TS.

**17.9.**     Alteração de Controle da TS. As Partes convencionam que qualquer alteração no Controle, direto ou indireto, da TS, durante os primeiros 10 (dez) anos de vigência do Contrato, dependerá de prévia autorização da ANEAS, que não poderá ser negada sem justo motivo, observada a notificação à ANEAS, por escrito, com, no mínimo, 60 (sessenta) dias de antecedência ("Notificação de Alteração de Controle").





Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

17.9.1.   Ao receber a Notificação de Alteração de Controle, a ANEAS terá um prazo de até 30 (trinta) dias contados do recebimento da referida notificação para manifestar se consente ou não com a alteração no Controle, direto ou indireto, da TS; sendo certo que o silêncio da ANEAS no referido prazo significará o consentimento tácito à alteração de Controle, direto ou indireto, da TS objetivado na Notificação de Alteração de Controle.

17.9.2.   Caso a ANEAS, no prazo de 30 (trinta) dias supra previsto rejeite, justificadamente, a alteração de Controle, direto ou indireto da TS, mediante notificação por escrito à TS ("Notificação de Rejeição") e caso a TS mantenha a alteração de Controle, a TS deverá informar o fato para a ANEAS em um prazo de até 30 (trinta) dias do recebimento da Notificação de Rejeição ("Notificação de Confirmação da Alteração de Controle"), a ANEAS terá o direito de rescindir o presente Contrato desde que a ANEAS envie notificação por escrito à TS em um prazo de até 30 (trinta) dias contados do recebimento da Notificação de Confirmação de Alteração de Controle ("Notificação de Rescisão"), comunicando a rescisão e a data em que a rescisão se tornará eficaz ("Data de Eficácia da Rescisão"). A Data de Eficácia da Rescisão deverá ser uma data dentro do período mínimo de 60 (sessenta) dias e máximo de 90 (noventa) dias contados da data de recebimento pela TS da Notificação de Rescisão. Caso a ANEAS não envie a Notificação de Rescisão no prazo supra previsto de 30 (trinta) dias contados do recebimento da Notificação de Confirmação de Alteração de Controle, a ANEAS decairá do direito de rescindir este Contrato pela alteração de Controle, direto ou indireto da TS, indicada na Notificação de Alteração de Controle.

17.9.3.   Caso este Contrato seja rescindido nos termos e condições dispostos na Cláusula 17.9.2. acima, a TS incorrerá no dever de indenizar a ANEAS nos termos e condições acordados na Cláusula 10.4 acima.

**17.10.**   Transações com Partes Relacionadas. Sem prejuízo do Contrato de Administração Predial anexo ao presente instrumento e da gestão de locações a ser prestada pela TS Gestora, nos termos previstos neste Contrato, cujas condições de mercado já foram verificadas e acordadas entre as Partes, todos os demais contratos que forem, eventualmente, celebrados entre a TS e uma pessoa do seu respectivo grupo econômico para a consecução de prestações integrantes do objeto deste Contrato, com repercussão sobre o Fluxo Financeiro, deverão observar e conter parâmetros e condições justas de mercado. Sem prejuízo do disposto retro, a TS deverá informar a ANEAS sobre (i) qualquer contrato ou relacionamento comercial, atual, esperado ou prospectivo, entre a TS e/ou outra pessoa de seu grupo econômico, de um lado, e um pretendente locatário de espaço do Conjunto São Luís, de outro lado; e (ii) sobre a natureza de tal contrato ou relacionamento comercial antes da celebração do pertinente contrato de locação entre a ANEAS e tal terceiro com o intermédio da TS e/ou outra pessoa de seu grupo econômico.

**17.11.**   Solidariedade em relação a Subcontratos. A TS, neste ato, assume e reconhece, perante a ANEAS, integral solidariedade por todas as obrigações que, eventualmente, forem imputadas a terceiros, por meio de subcontratos celebrados pela TS, que tenham por escopo a realização de prestações que constituem objeto deste Contrato, exceto por obrigações previstas em subcontratos aos quais a ANEAS tenha prestado sua anuência.

**17.12.**   Potencial Concorrência e *Chinese Wall*. Caso a TS ou outra sociedade integrante do grupo econômico da TS passe a administrar outro empreendimento imobiliário que concorra no mesmo mercado relevante do Conjunto São Luís, a ANEAS terá o direito de solicitar que a TS ou seu grupo econômico estabeleça uma *Chinese wall* para separar eficazmente as equipes que trabalham na

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

administração do Conjunto São Luís e na administração do empreendimento concorrente. Para fins deste Contrato, entende-se por mercado relevante do Conjunto São Luís devidamente identificado no mapa que constitui o Anexo 17.12 deste Contrato.

**17.13.**   Governança, controle e monitoramento do Contrato. As Partes, em um prazo de até 30 (trinta) dias contados da superação das Condições Suspensivas, indicarão, por escrito, as suas respectivas equipes que atuarão em seus nomes na execução das prestações, atividades e funções previstas neste Contrato ("Equipes").

17.13.1.   Após a indicação das Equipes, nos termos da Cláusula 17.13 acima, e até conclusão das Obras de Melhoria e Readequação, as Equipes das Partes deverão reunir-se, mensalmente, em local a ser designado pela TS no Conjunto São Luís, para: (i) discutir e avaliar o progresso da execução do Contrato; (ii) apresentar eventuais problemas que surjam e relacionem-se ao escopo do Contrato; e (iii) convencionar, dentro dos limites deste Contrato, soluções e providências que devem ser adotadas pelas Partes para dar efetivo e satisfatório cumprimento ao Contrato.

17.13.2.   A Equipe da TS deverá enviar à Equipe da ANEAS: (i) cópia do Projeto Modificativo ou do Projeto de Reforma, conforme o caso; (ii) cópia do Contrato de Construção celebrado com a Construtora; (iii) cópias dos contratos de locação celebrados com relação ao Conjunto São Luís; e (iv) cópias dos relatórios de auditoria contábil relativos à exploração comercial do Conjunto São Luís.

17.13.3.   Cada uma das Partes poderá substituir qualquer integrante de sua respectiva Equipe mediante notificação à outra Parte.

17.13.4.   Não obstante o disposto acima, a Equipe da TS encaminhará relatório mensal à ANEAS, até o dia 10 (dez) de cada mês, informando-a sobre o andamento do processo de aprovação dos Projetos junto à Prefeitura de São Paulo, bem como prestará contas com relação aos mandatos outorgados nos termos da Cláusula 2.3 acima.

17.13.5.   Após a conclusão das Obras de Melhoria e Readequação e até o término da vigência do Contrato, a ANEAS terá o direito de convocar a TS para uma reunião, que deverá se realizar em local designado no Conjunto São Luís, observado o limite máximo de uma reunião mensal, com antecedência mínima de 15 (quinze) dias e prévia indicação da pauta a ser discutida, devendo a TS comparecer a tal reunião.

**17.14.**   Cessão. Concordam as Partes que a cessão total ou parcial dos direitos e/ou obrigações decorrentes do presente Contrato dependerá de concordância prévia por escrito de todas as Partes, salvo (i) em se tratando de cessão para Afiliada, e desde que a Parte cedente permaneça solidariamente responsável perante a outra Parte pelo cumprimento das obrigações cedidas; e (ii) nas hipóteses específica e explicitamente previstas neste Contrato.

**17.15.**   Sucessão. Este instrumento vincula as Partes e seus sucessores a qualquer título.

**17.16.**   Notificações. Todas as notificações, consentimentos, solicitações e outras comunicações previstas neste instrumento serão realizadas por escrito e deverão ser entregues em mãos, enviadas por meio de carta registrada ou serviço de courier reconhecido (com aviso de recebimento), e-mail ou das vias cartorária ou judiciária, para os seguintes representantes das Partes:





Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

Se para a ANEAS:

**ASSOCIAÇÃO NÓBREGA DE EDUCAÇÃO E ASSISTÊNCIA SOCIAL - ANEAS**
Avenida Paulista n. 2.300, conjuntos 172 e 174, Consolação
Município de São Paulo, Estado de São Paulo
CEP 01310-300
A/C: Sr. João Geraldo Kolling
E-mail: administradorbra@jesuitasbrasil.org.br

Se para a TS:

**TS-26 PARTICIPAÇÕES LTDA.**
Avenida Nações Unidas, nº 12.901, Torre Norte, 34º andar, sala 33
São Paulo-SP
CEP 04578-000
A/C: Sr.(a) Diretor Presidente
E-mail: dcherman@tishmanspeyer.com.br

Com cópias para, sem a qual, não será considerada entregue:
Avenida Nações Unidas, nº 12.901, Torre Norte, 34º andar, sala 33
São Paulo - SP
CEP 04578-000
A/C: Sr.(a) Diretor(a) Jurídico(a)
E-mail: hbittar@tishmanspeyer.com.br

Se para a TS Administradora:

**TSM DESENVOLVIMENTO IMOBILIÁRIO LTDA.**
Avenida Nações Unidas, nº 12.901, Torre Norte, 34º andar
São Paulo - SP
CEP 04578-000
A/C: Sr. Diretor em exercício

Se para a TS Gestora:

**TS GESTÃO E CONSULTORIA IMOBILIÁRIA LTDA.**
Avenida Nações Unidas, nº 12.901, Torre Norte, 34º andar, sala 27
São Paulo - SP
CEP 04578-000
A/C: Sr.(a) Diretor Presidente
E-mail: dcherman@tishmanspeyer.com.br

Com cópias para, sem a qual, não será considerada entregue:
Avenida Nações Unidas, nº 12.901, Torre Norte, 34º andar, sala 27
São Paulo-SP
CEP 04578-000
A/C: Sr.(a) Diretor(a) Jurídico(a)
E-mail: hbittar@tishmanspeyer.com.br

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

17.16.1.    As notificações enviadas nos termos desta Cláusula serão consideradas entregues: (i) na ocasião em que forem entregues, se entregues pessoalmente; e (ii) na ocasião em que forem recebidas, se enviadas por correio, serviço de *courier*, e-mail ou via cartorária.

17.16.2.    Qualquer Parte poderá mudar o endereço para o qual a notificação deverá ser enviada por notificação escrita às demais Partes de acordo com esta Cláusula 17.16, sendo que com relação a esta disposição, a notificação será considerada recebida apenas mediante reconhecimento de tal recebimento por cada uma das demais Partes.

**17.17.**    Anexos. Os anexos a este Contrato deverão ser interpretados como parte integrante deste Contrato. Em caso de conflito entre qualquer disposição contida em um anexo a este Contrato e uma disposição constante do corpo principal deste Contrato, deverá prevalecer a disposição constante do corpo principal deste Contrato.

**17.18.**    Acordo integral. Este Contrato, juntamente com seus anexos, contém o acordo integral das Partes com relação ao objeto aqui tratado, substituindo todo e qualquer prévio entendimento escrito ou verbal entre elas havido referente a tal objeto.

**17.19.**    Benefício exclusivo das Partes. As Partes declaram e reconhecem que (i) este Contrato é celebrado para o benefício e proteção apenas das Partes descritas no preâmbulo e seus respectivos sucessores e cessionários autorizados nos termos deste Contrato; e (ii) nenhuma outra pessoa está legitimada a pleitear, judicialmente ou extrajudicialmente, qualquer benefício ou direito com fundamento neste Contrato em face de qualquer uma das Partes.

## CLÁUSULA XVIII.    DA POLÍTICA ANTICORRUPÇÃO

**18.1.**    Cada uma das Partes (individualmente, "Parte Declarante") declara e garante às demais Partes e à TS Garantidora que:

(i)    tal Parte Declarante, aqui incluindo qualquer pessoa de seu grupo, suas subsidiárias, controladas e coligadas, bem como seus respectivos Representantes, reconhece que deve cumprir integralmente as exigências de todas as leis aplicáveis, regulamentos e requisitos administrativos referentes ou relacionados a suborno, corrupção, sonegação fiscal, condutas anticompetitivas, lavagem de dinheiro e/ou de qualquer forma referentes à ocultação de bens e valores, enriquecimento ilícito, condutas contra a ordem econômica e contra a administração pública, nacional ou estrangeira (em conjunto, "Leis Anticorrupção");

(ii)    possui e manterá políticas e procedimentos destinados a assegurar o cumprimento das Leis Anticorrupção durante toda a vigência do Contrato;

(iii)    tal Parte Declarante e seus Representantes estão atualmente e permanecerão em situação de conformidade com as Leis Anticorrupção. Nenhuma ação, demanda ou outro processo perante qualquer tribunal, órgão ou agência governamental ou outra autoridade que envolva a Parte Declarante ou seus Representantes com respeito às Leis Anticorrupção se encontra pendente ou iminente;

(iv)    tal Parte Declarante e seus Representantes envolvidos na prestação de serviços previstos neste Contrato não se tornarão (a) um Representante de qualquer governo (federal,



—

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

regional ou local) nem qualquer subdivisão política, ministério, agência ou partido político, (b) Representante de empresa detida ou controlada por um governo, (c) candidato a cargo político ou alguém que detenha um cargo político, (d) Representante de uma organização pública internacional, tal como o Banco Mundial, durante a vigência deste Contrato;

(v)      tal Parte Declarante e seus Representantes não tomarão qualquer medida que possa levar qualquer outra Parte ou qualquer Representante de tal Parte a ficar em situação de violação de qualquer lei, inclusive, mas não limitado, às Leis Anticorrupção ou quaisquer disposições da presente Cláusula XVIII;

(vi)     tal Parte Declarante e seus Representantes abster-se-ão de, direta ou indiretamente, pagar, oferecer, prometer, dar ou autorizar outra pessoa a pagar, oferecer, prometer ou dar dinheiro ou qualquer coisa de valor a (a) qualquer Representante de qualquer governo (federal, regional ou local) ou qualquer subdivisão política, ministério, agência ou partido político, (b) qualquer Representante de uma empresa detida ou controlada por um governo, (c) um partido político, um candidato a cargo político ou pessoa que detenha cargo político, (d) um Representante de uma organização pública internacional tal como o Banco Mundial ou (v) a qualquer outra pessoa, a fim de obter, manter ou direcionar negócios a qualquer das Partes, de forma a obter vantagem ilícita para qualquer das Partes ou garantir o cumprimento impróprio dos deveres daquela pessoa;

(vii)    qualquer comissão ou outra taxa paga a qualquer das Partes nos termos desta política será para serviços efetivamente prestados, e nenhuma parte de qualquer taxa paga a qualquer das Partes, direta ou indiretamente, serão pagos ou revertidos em benefício de qualquer Representante de qualquer governo (federal, regional ou local) ou qualquer subdivisão política, ministério, agência ou autoridade deste, uma empresa detida ou controlada por um governo ou partido político, ou ainda um Representante de um partido político ou candidato a cargo político;

(viii)   efetuará todos os pagamentos por cheque ou transferência eletrônica pagável à outra Parte ou a uma conta em nome da outra em instituição financeira de renome localizada no Brasil. Os pagamentos não serão feitos em dinheiro a terceiros ou fora do Brasil;

(ix)     manterá livros e registros necessários em relação aos serviços estabelecidos neste Contrato, disponibilizando tais livros e registros para exame, se solicitado; e

(x)      concorda em entregar notificação por escrito à outra Parte e à Garantidora TS, a qualquer momento durante a vigência deste Contrato, caso seus Representantes deixem de cumprir, tiverem violado ou ficarem cientes de quaisquer fatos que sugiram uma violação de qualquer de suas representações, garantias e avenças estabelecidas nos itens (i) a (ix) acima (em conjunto, as "Disposições da Política Anticorrupção") ou seus respectivos Representantes se tornarem objeto de qualquer investigação por qualquer governo ou órgão regulador por violação das Leis Anticorrupção. Quando do recebimento da referida notificação ou se a Parte Declarante se tornar ciente de que a outra tenha violado, ou seja, razoavelmente passível de violar quaisquer das Disposições da Política Anticorrupção, a Parte prejudicada terá o direito, a seu exclusivo critério, rescindir este Contrato imediatamente.





Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS – TS / TS Administradora/ TS Gestora

**CLÁUSULA XIX.**        **DA ARBITRAGEM**

**19.1.**        Todas as questões relativas à interpretação e ao descumprimento das obrigações previstas neste Contrato serão submetidas à arbitragem de acordo com as regras de arbitragem para decisão definitiva da Câmara de Comércio Internacional ("ICC"), em procedimento a ser administrado pela mesma ("Tribunal Arbitral").

**19.2.**        A sentença arbitral a ser prolatada pelo Tribunal Arbitral poderá ser levada ao foro da Comarca da Capital do Estado de São Paulo para determinar a sua execução. Caso as regras procedimentais da ICC sejam silentes em qualquer aspecto procedimental, tais regras serão suplementadas pelas disposições da Lei Federal n. 9.307, de 23 de setembro de 1996.

**19.3.**        O Tribunal Arbitral será formado por 3 (três) árbitros, sendo um nomeado pela TS, outro pela ANEAS e o terceiro pelos 2 (dois) árbitros indicados pela TS e pela ANEAS. Na hipótese de os árbitros indicados pelas Partes não chegarem a um consenso quanto ao terceiro árbitro no prazo de 10 (dez) dias, contados da data da nomeação do segundo árbitro, o terceiro árbitro será indicado pela ICC, no prazo máximo de 10 (dez) dias da data em que se verificar o impasse.

**19.4.**        A arbitragem será realizada na Cidade de São Paulo, Estado de São Paulo, Brasil, em português, e o procedimento, assim como os documentos e as informações levados à arbitragem, estarão sujeitos ao sigilo.

**19.5.**        A sentença arbitral será considerada final e definitiva, obrigando as Partes, as quais renunciam expressamente a qualquer recurso. Não obstante, cada uma das Partes se reserva o direito de recorrer ao Poder Judiciário com o objetivo de (a) assegurar a instituição da arbitragem, (b) obter medidas cautelares de proteção de direitos previamente à instituição da arbitragem, sendo que qualquer procedimento neste sentido não será considerado como ato de renúncia à arbitragem como o único meio de solução de conflitos escolhido pelas Partes, e (c) executar qualquer decisão do Tribunal Arbitral, inclusive, mas não exclusivamente, da sentença arbitral. As Partes não possuirão qualquer dever de confidencialidade em relação à sentença arbitral, a qual poderá ser integralmente publicada ou divulgada por qualquer das Partes.

19.5.1.        Na hipótese de as Partes recorrerem ao Poder Judiciário, o foro da Comarca da Capital do Estado de São Paulo será o competente para conhecer de qualquer procedimento judicial.

Contrato Complexo e Atípico de Estruturação e Desenvolvimento de Empreendimento Imobiliário e Outras Avenças
ANEAS -- TS / TS Administradora/ TS Gestora

E, por estarem assim justas e contratadas, as Partes assinam o presente instrumento em 4 (quatro) vias de igual forma e teor, em presença das testemunhas identificadas a seguir.

São Paulo, 08 de abril de 2020.

**ASSOCIAÇÃO NÓBREGA DE EDUCAÇÃO E ASSISTÊNCIA SOCIAL - ANEAS**
João Geraldo Kolling                   Carlos Alberto Contieri

**TS 26 PARTICIPAÇÕES LTDA.**

**TS GESTÃO E CONSULTORIA IMOBILIÁRIA LTDA.**

**TSM DESENVOLVIMENTO IMOBILIÁRIO LTDA.**

Testemunhas:

1. 
Nome: NATALIA OANTON CAND.
CPF/ME: 379.529.988-89
RG: 46.739.858-6

2. 
Nome: JOSÉ ROBERTO F. ZIBETO
CPF/ME: 082.886.768.20
RG: 16.473.359-0

Página **52** de **52**